Clara May **SHEFFLER** and Raymond **Sheffler, Appellants,**

v.

Victor A. **ARANA, M.D., Respondent.**

No. WD 53552.

Missouri Court of Appeals, Western District.

July 15, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 2, 1997.

---

Richard F. Lombardo, Shaffer Lombardo Shurin, Kansas City, for appellants.

R. Dan Boulware, Kenneth E. Siemens, Watkins, Boulware, Lucas, Miner, Murphy & Taylor, L.L.P., St. Joseph, for respondent.

Before ULRICH, C.J., P.J., and HANNA and LAURA DENVIR STITH, JJ.

ULRICH, Chief Judge, Presiding Judge.

Victor A. Arana, M.D. appeals from the $246,500 judgment in favor of Clara May Sheffler and Raymond Sheffler in their medical malpractice action arising from Dr. Arana's care and treatment of Mrs. Sheffler in 1993. Specifically, Dr. Arana was found to have been negligent in performing a primary anastomosis rather than a colostomy after failing to properly prepare Mrs. Sheffler's bowels when she was diagnosed with diverticulosis of the sigmoid colon and in failing to diagnose and treat Mrs. Sheffler's postoperative complications.

Dr. Arana raises five points of error on appeal. He contends that the trial court erred in (1) failing to declare a mistrial during closing argument when plaintiffs' counsel implied that he left his employment with Heartland Hospital because he was "in trouble with the hospital"; (2) overruling his objections for cause regarding three venirepersons who had personal and/or professional relationships with plaintiffs or plaintiffs' counsel; (3) overruling his motion for directed verdict because plaintiffs failed to make a submissible case through expert testimony; (4) submitting to the jury verdict directing instruction No. 8 because plaintiffs failed to make a submissible case and the evidence did not support plaintiffs' specific allegations of negligence; and (5) overruling his motion for judgment notwithstanding the verdict. The judgment of the trial court is affirmed.

## FACTS

Clara May Sheffler went to see Dr. Victor Arana, her family physician, on June 7, 1993, with complaints of abdominal pain and constipation. Dr. Arana scheduled Mrs. Sheffler for a colonoscopy to be performed at the hospital the next day and prescribed Golytely, a laxative medication, to evacuate the bowels. On June 8, Dr. Arana performed the colonoscopy and a barium enema x-ray. The tests revealed that Mrs. Sheffler had diverticulosis of the sigmoid colon. Diverticulosis is the presence of many small diverticula, or small tubular sacs or pockets, branching off the colon. There was also evidence of inflammation of the diverticula, and one of the diverticulum had perforated and formed an abscess. Despite these findings, Dr. Arana decided to defer surgery.

Two days later, on June 10, Dr. Arana received a telephone call from Mrs. Sheffler's husband, Ray Sheffler, who indicated

that Mrs. Sheffler's condition had further deteriorated and that she was experiencing a substantial amount of abdominal pain. Dr. Arana prescribed the antibiotic Keftab and Golytely and placed Mrs. Sheffler on a clear liquid diet. Mrs. Sheffler, however, did not take the antibiotic or the Golytely.

Dr. Arana received another telephone call on June 14, from Mr. Sheffler informing him that Mrs. Sheffler's condition had worsened and that she was experiencing pain, bloating, and fever. Surgery was then scheduled for June 16. Whether Dr. Arana told Mrs. Sheffler to take Golytely and Keftab in preparation for the surgery was disputed.

On June 16, Mrs. Sheffler was admitted to Heartland Hospital for colon surgery. Dr. Arana obtained a surgical permit from Mrs. Sheffler allowing for sigmoid resection or possible colostomy. Upon entering Mrs. Sheffler's abdomen, Dr. Arana found a large inflammatory mass lying on the pelvic area. Dr. Arana then performed a sigmoid colon resection with primary anastomosis wherein he removed the diseased portion of Mrs. Sheffler's colon and surgically reattached the ends of the colon. He did not perform a colostomy. A colostomy is the surgical creation of an opening between the colon and the surface of the body that allows a patient to temporarily pass their bowels into a bag. It is performed when a the colon is not immediately reattached after removal of the diseased portion because the bowels have not been properly prepared for surgery (i.e. feces remain in the bowels) or an infection is present. An anastomosis is then performed four to eight weeks later, after the infection has been treated with antibiotics, wherein the colostomy is "taken down" and the colon is reattached. Dr. Arana testified that he saw no infection or feces after removing the inflammatory mass on the colon, therefore, he reattached the colon. Because the infection had spread to the appendix, the appendix was also removed.

Mrs. Sheffler remained in the hospital after her surgery and for three days seemed to follow a normal postoperative course. She was alert with no pain and was walking up and down the halls. On June 20, four days after her surgery, however, Mrs. Sheffler suddenly started to experience extreme lower abdominal pain that radiated to her chest. Dr. Arana examined Mrs. Sheffler and found that she had an increased heart rate and that her abdomen was soft. He also performed a rectal examination and found a small amount of feces in the ampulla, the dilated portion of the rectum next to the anal canal. In his hospital progress notes, Dr. Arana noted that Mrs. Sheffler had not had a bowel movement and "[m]ay need colostomy for decompression." He also prescribed pain medication.

Because of Mrs. Sheffler's increased heart rate, Dr. Arana obtained a cardiopulmonary consult the next day from Dr. Stanley Crie. Finding everything to be normal from a cardiopulmonary standpoint, Dr. Crie suggested that Mrs. Sheffler's symptoms could be the result of complications from the surgery. Consequently, Dr. Arana ordered an x-ray, which showed "free air" under the diaphragm.

During this time, Mrs. Sheffler's white blood cell count began to rise, indicating the presence of an infection. A normal white blood cell count is between 9,000 and 10,000. On June 21, Mrs. Sheffler's white blood cell count was 10,500. On June 23, it had risen to 12,000, and Dr. Arana suspected that Mrs. Sheffler, due to antibiotics, had developed colitis, an inflammation of the colon. As a result, Dr. Arana discontinued antibiotics, and Mrs. Sheffler's white blood cell count rose sharply to 15,700. Despite her high blood cell count, Dr. Arana discharged Mrs. Sheffler from the hospital on June 26. At the time of discharge, her blood count had lowered to 13,000 but was still above normal. Dr. Arana instructed Mrs. Sheffler to resume her medications and to return to his office in eight days for follow up.

Two days later, on June 28, Mrs. Sheffler saw Dr. Arana at his office with continued complaints of abdominal pain. Dr. Arana ordered an x-ray and CT scan. The tests revealed "some residual free air" under the diaphragm. On July 2, Mrs. Sheffler saw Dr. Susan Brown, a nephrologist, for a possible urinary tract infection.

As Mrs. Sheffler's condition progressively worsened, she returned to Dr. Arana's office

on July 7. Again, she complained of abdominal pain and nausea. Suspecting that Mrs. Sheffler had a duodenal ulcer, Dr. Arana prescribed Prilosic, an acid blocker. Still having problems with bloating and nausea, Mrs. Sheffler returned to Dr. Arana's office on July 12. Dr. Arana scheduled an endoscopy and a colonoscopy for the next day. As a result of the tests, Dr. Arana diagnosed Mrs. Sheffler with candidiasis, a fungus infection in the esophagus, and a pyloric channel ulcer. He also concluded that the anastomosis was healing fine. Mrs. Sheffler was then readmitted to the hospital on July 13, for treatment of her upper GI problems.

On July 22, an x-ray revealed a considerable increase of air under the diaphragm. Dr. Arana suspected a ruptured viscus[1] or a perforated anastomosis. He did not, however, schedule her for surgery at this time because he thought her condition was improving. For the next four days, Dr. Arana continued to note in the hospital progress notes that Mrs. Sheffler's condition was improving.

On July 26, Dr. Edward Beheler saw Mrs. Sheffler at Dr. Arana's request for consultation. Thereafter, a barium enema x-ray was ordered and revealed a fistula, or abnormal passage, at the site of the colonic anastomosis. Dr. Beheler concluded that Mrs. Sheffler's problems were caused by the "localized sepsis related to [the] leak at the colonic anastomosis" and immediately scheduled her for surgery.

During Mrs. Sheffler's second surgery on July 30, 1993, Dr. Beheler, with the assistance of Dr. Arana, found an abscessed cavity the size of two fists and a disrupted anastomosis.[2] He believed that fecal material had leaked into the abdominal cavity. Multiple abscesses were drained, a small, inflamed piece of the bowel was removed and sent to pathology, and a temporary colostomy was performed. Mrs. Sheffler remained in intensive care for six days following surgery. She was finally discharged from the hospital on August 28.

In November 1993, Mrs. Sheffler reentered the hospital for a take down of the colostomy and reattachment of her colon. Dr. Beheler performed the successful surgery.

Mr. and Mrs. Sheffler sued Dr. Arana on June 22, 1994, for medical malpractice alleging that Dr. Arana deviated from the applicable standard of care in his treatment of Mrs. Sheffler. The allegations included, in part, that Dr. Arana was negligent in performing a primary anastomosis rather than a temporary colostomy on June 16, 1993, and that he failed to diagnose and treat Mrs. Sheffler's postoperative complications.

At trial, each party presented an expert witness to testify regarding whether Dr. Arana breached the standard of care a reasonably prudent health care provider would have used under the same or similar circumstances in diagnosing and treating Mrs. Sheffler in 1993. Dr. Alfred Gervin, the Shefflers' expert, opined that Dr. Arana had violated the standard of care in two ways. First, he testified that Dr. Arana should not have performed a primary anastomosis because he had not properly prepared her bowels for that surgery. Specifically, he explained that a primary anastomosis should not be performed in conjunction with a resection if an infection or feces exists in the colon because the anastomosis would likely become infected and pull apart. Instead, a temporary colostomy is the better choice in that situation because any infection could be treated with antibiotics and the colon could be properly cleaned before the next operation to reattach the colon.

Dr. Gervin believed that Dr. Arana failed to mechanically reduce the amount of feces and stool with Golytely or to prescribe a nonabsorbent antibiotic to kill the bacteria in Mrs. Sheffler's colon within 24 hours of the operation, and, thus, the environment in Mrs. Sheffler's colon precluded a primary anastomosis. For this reason, he concluded that the primary anastomosis became infected and began to fail on June 20 or 21. He

---

1. Viscus means "organ" but is generally used to describe a ruptured colon, stomach, or small intestine, or a perforated ulcer.

2. Dr. Beheler testified that the anastomosis had actually pulled apart.

contended that the appropriate operation would have been a colostomy with a second operation four to six weeks later.

Secondly, Dr. Gervin testified that Dr. Arana failed to properly diagnosis and treat Mrs. Sheffler's postoperative complications from the leaking anastomosis. He explained that numerous "red flags" existed that should have alerted Dr. Arana to the problem no later than June 29, including Mrs. Sheffler's abdominal pain, the rising white blood cell count suggesting infection, and x-rays showing air in the abdomen. Furthermore, Dr. Gervin testified that the colonoscopy performed on July 13, from which Dr. Arana determined that the anastomosis was healing fine, did not reveal "a normal anastomosis in any sense of the word." Despite the "red flags," corrective measures were not taken until July 30, when Dr. Beheler performed a colostomy. Finally, Dr. Gervin acknowledged that Dr. Arana's failure to perform a colostomy on June 16, 1993, prolonged Mrs. Sheffler's hospitalization and suffering and caused her unnecessary medical procedures, surgeries, and expense.

Dr. Charles McGinty testified as an expert on behalf of Dr. Arana. He opined that Dr. Arana complied with the applicable standard of care in all aspects of his care and treatment of Mrs. Sheffler. Dr. McGinty stated that in light of Mrs. Sheffler's preparation for the June 8, 1993 colonoscopy (her taking the prescribed Golytely), the performance of the colonoscopy, and Mrs. Sheffler's adherence to a clear liquid diet from June 10 until June 16, the date of the initial surgery, her bowels had been sufficiently prepared for the surgery. The doctor, however, conceded that Mrs. Sheffler may have eaten two meals on June 9 and 10, that he did not know when she had had her last bowel movement, and that Dr. Arana did not prep her bowels within 24 hours of the surgery.[3] Despite these concessions, Dr. McGinty testified there was no indication based on Dr. Arana's operative notes that a colostomy rather than a primary anastomosis should have been performed.

Dr. McGinty further testified that Dr. Arana's treatment of Mrs. Sheffler following the June 16 surgery was within the standard of care. Although he admitted that Mrs. Sheffler developed five symptoms of a leaking anastomosis, i.e. abdominal pain, periodic loss of bowel sounds, rising white blood cell count, elevated heart rate, and free air under the diaphragm, beginning June 20, Dr. McGinty explained that the postoperative symptoms were normal considering her urological and upper GI problems including the pyloric channel ulcer. He, however, acknowledged that Mrs. Sheffler's condition progressively worsened after July 22 or 23, while Dr. Arana continued to note her improvement in his hospital progress notes.

Finally, Dr. McGinty conceded that the July 28 barium enema x-ray revealed a "small leak" in the colonic anastomosis. That observation conflicted with Dr. Beheler's description following the July 30 surgery that the anastomosis had been totally disrupted and pulled apart. Dr. McGinty explained the conflict by speculating that the "small leak" had pulled apart while the colon was being handled during the July 30 surgery.

Dr. Arana made a motion for directed verdict at the close of plaintiffs' evidence and at the close of all the evidence claiming that plaintiffs failed to make a submissible case. The motions were overruled, and the jury returned a verdict in the Shefflers' favor. Damages for Mrs. Sheffler were assessed in the amount of $280,000 representing $90,000 in past economic damages and $190,000 in past non-economic damages. Damages for Mr. Sheffler in his loss of consortium claim were assessed in the amount of $10,000 for past non-economic damages. Fault was apportioned against Mrs. Sheffler at 15% and against Dr. Arana at 85% resulting in a net recovery of $238,000 on Mrs. Sheffler's

---

**3.** There was no dispute that Mrs. Sheffler did not take Golytely after June 10. There was a dispute, however, regarding the reason Mrs. Sheffler did not take Golytely after June 10. She testified that she quit taking it after it made her nauseous and that Dr. Arana never instructed her to take it on June 15 in preparation for surgery. Dr. Arana testified that he did instruct her to take it on June 15.

claims and $8,500 on Mr. Sheffler's. This appeal followed.

## I. CLOSING ARGUMENT

■ In Dr. Arana's first point on appeal, he claims that the trial court erred in failing to declare a mistrial during closing argument. He asserts that the Shefflers' attorney implied to the jury with the following statement that Dr. Arana left his employment at Heartland Hospital in St. Joseph, Missouri, because of problems he was having with the hospital:

> And you notice that throughout the case Dr. Arana does not deny—did not deny and was not asked by Mr. Lombardo at any time, "Were you in trouble with the hospital?" Their statements stand unrefuted. And he left in August of '93.

Dr. Arana, by counsel, objected to the statement, asked for a curative instruction, and when the requests were denied, moved for mistrial. The motion was denied. Dr. Arana argues that the inference was irrelevant to any issue at trial, unsupported by the evidence in the record, and precluded by the court's granting of a motion in limine wherein evidence concerning prior claims or lawsuits brought by Dr. Arana was inadmissible.

■ The trial court has broad discretion in determining the propriety of closing argument. *Perkins v. Runyan Heating & Cooling Services, Inc.*, 933 S.W.2d 837, 842 (Mo. App.1996). Furthermore, counsel is traditionally afforded wide latitude to suggest inferences from the evidence. *Id.* The trial court is in a superior position to make a determination as to the prejudicial effect of closing argument and to fashion a remedy for improper closing arguments, and, therefore, the trial court's ruling will not be disturbed on appeal absent an abuse of discretion. *Id.*

■ A mistrial is a drastic remedy, and the decision to grant one is largely within the discretion of the trial court. *Blake v. Irwin*, 913 S.W.2d 923, 933 (Mo.App.1996). An appellate court will reverse the trial court's decision only where there has been a manifest abuse of discretion. *Id.* Manifest abuse exists where the error is so grievous that prejudice cannot otherwise be removed. *Id.*

Counsel's argument that Dr. Arana never denied being "in trouble with the hospital" was relevant to this case, supported by evidence in the record, and was not related to the evidence excluded prior to trial. Both Mr. and Mrs. Sheffler testified that when Dr. Arana saw Mrs. Sheffler on June 20, 1993, the day she started to experience lower abdominal pain, he said, "It's my fault; it's my fault; it's my fault; I should have done the colostomy; I know I'm going to be in trouble with the hospital; because I didn't do the colostomy, they're going to wonder why." Though Dr. Arana denied making the statement, "It's my fault; I should have done the colostomy," he did not deny during direct or cross-examination saying that he would be in trouble with the hospital for failing to perform the surgery. Dr. Arana's alleged statement to the Shefflers was relevant to the issue of whether he negligently performed the wrong operation on June 16, 1993, and was not related to evidence excluded prior to trial regarding *prior* claims and lawsuit brought by Dr. Arana against the hospital. The statement related only to Mrs. Sheffler's treatment in 1993, and counsel's argument regarding whether Dr. Arana denied making the statement was proper and supported by the record. While the juxtaposition of Dr. Arana's statement with counsel's statement during closing argument regarding the doctor's departure may have created the impression that Dr. Arana left because of his treatment of Mrs. Sheffler, it was not so prejudicial as to require a mistrial. The trial court did not abuse its discretion in denying the motion for mistrial. Point one is denied.

## II. CHALLENGE OF VENIREPERSONS FOR CAUSE

■ In his second point on appeal, Dr. Arana claims that the trial court erred in denying his challenges for cause against three members of the jury panel who had personal and/or professional relationships with plaintiffs or plaintiffs' counsel. During voir dire, Ms. McClure stated that she and her husband, who is a dentist, are represented by an attorney of the Shefflers' counsels' firm and that she had met the Shefflers'

attorneys before. Ms. Nelson disclosed that she knew Raymond Sheffler in 1968 when she worked with him and that she had not had contact with him since then. She also testified that she knew several attorneys within the Shefflers' counsels' firm socially and that an attorney with the firm drafted her father's trust for which she is trustee. Finally, Ms. Gower disclosed that she was acquainted with two attorneys from the Shefflers' counsels' firm through her teaching profession. All three venirepersons stated that despite their associations with the Shefflers or their attorneys, they could be fair and impartial jurors.

The trial court has broad discretion to determine whether prospective jurors are qualified. *Ray v. Gream*, 860 S.W.2d 325, 331 (Mo. banc 1993). Thus, its rulings on that issue will not be disturbed on appeal absent an abuse of discretion or a real probability of injury to the complaining party. *Id.* Because the trial court is in a superior position to determine a venireperson's ability to impartially follow the law, any doubts as to its findings will be resolved in its favor. *Id.; State v. Walton*, 796 S.W.2d 374, 378 (Mo. banc 1990).

█ The trial court's determination regarding the qualification of a venireperson is a factual one made on the basis of questions and answers elicited on voir dire as well as the demeanor and credibility of the venireperson. *Morris v. Spencer*, 826 S.W.2d 10, 13 (Mo.App.1992). The critical question in reviewing the exercise of discretion is whether the challenged venireperson indicated unequivocally her ability to evaluate the evidence fairly and impartially. *Ray*, 860 S.W.2d at 331–332.

A venireperson is not absolutely disqualified because she is personally or professionally acquainted with a party, *Morris*, 826 S.W.2d at 11, or because she is acquainted with, or is a client of, an attorney in the case. *State v. Grant*, 394 S.W.2d 285, 289 (Mo. 1965).

The trial court's determination of the jurors' qualification was not an abuse of discretion. Despite their acquaintances with Mr. Sheffler and the Shefflers' attorneys, all three venirepersons unequivocally exhibited

that they would be fair and impartial in reviewing the evidence and following the law in this case. Beyond Dr. Arana's mere assertions of disqualification based on the venirepersons' acquaintances, he has failed to demonstrate facts in the record showing actual prejudice by these venirepersons. Thus, the trial court did not err in denying Dr. Arana's challenges for cause against Venirepersons McClure, Nelson, and Gower. Point two is denied.

## III. SUBMISSIBILITY OF MEDICAL NEGLIGENCE CASE

█ In his next three points, Dr. Arana claims that the Shefflers failed to make a submissible case of medical negligence. He contends, therefore, that the trial court erred (1) in overruling his motion for directed verdict, (2) in submitting verdict instruction No. 8 to the jury, which submitted two separate allegations of negligence in the disjunctive, and (3) in overruling his motion for judgment notwithstanding the verdict.

The verdict directing instruction for Mrs. Sheffler's medical malpractice claim read as follows:

### INSTRUCTION NO. 8

In your verdict you must assess a percentage of fault to Defendant Victor A. Arana, M.D., whether or not Plaintiff Clara May Sheffler was partly at fault, if you believe:

First, Defendant Victor A. Arana, M.D. either:

failed to do a temporary colostomy when performing the colon surgery on June 16, 1993, or

failed to diagnose and treat the post-operative complications in a timely manner, and

Second, Defendant Victor A. Arana, M.D., in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to Plaintiff Clara May Sheffler.

Error occurs when an instruction is given and no substantial evidence to support the issues submitted was presented. *Ladish v. Gordon*, 879 S.W.2d 623, 628 (Mo. App.1994). Furthermore, when an instruction is given in the disjunctive, evidence must support the submission of each allegation. *Id.* "If each allegation presented in the instruction is not supported by the evidence, and the giving of the instruction is not supported by the evidence, then the giving of the instruction is error." *Id.*

In determining whether plaintiff made a submissible case against defendant, the reviewing court views the evidence in the light most favorable to plaintiff, giving plaintiff the benefit of all favorable evidence and reasonable inferences drawn therefrom, and disregards all contrary evidence. *Hiers v. Lemley*, 834 S.W.2d 729, 732 (Mo. banc 1992); *Ladish*, 879 S.W.2d at 627. To make a submissible case of negligent medical treatment, plaintiff must establish that (1) an act or omission of defendant failed to meet the requisite medical standard of care, (2) the act or omission was performed negligently, and (3) there was a causal connection between the act or omission and plaintiff's injury. *Hiers*, 834 S.W.2d at 732.

Generally, expert testimony must be introduced to establish the standard of care in a medical negligence case. *Ladish*, 879 S.W.2d at 628. Negligence is the failure to use that degree of skill and learning ordinarily used by members of one's profession under the same or similar circumstances. *Id.* at 634. In articulating the appropriate legal standard of care, it is insufficient for an expert merely to use the terms "accepted medical standards" or "standards of care." *Id.* Instead, an expert should be properly oriented with the meaning of negligence in a health care provider context and, in fact, employ the legal standards in offering his opinion. *Id.* Additionally, the jury must be informed that the expert has utilized the appropriate legal standards. *Id.* The purpose of these requirements is to prevent experts from relying upon their own views of acceptable practice rather than applying the objective legal standards. *Id.* at 635.

In arguing that the Shefflers failed to make a submissible case on either of their medical negligence theories, Dr. Arana asserts that the Shefflers' expert, Dr. Gervin, failed to articulate his understanding of the applicable standards of care or to state that he was employing the standards in offering his opinions. Dr. Arana claims that at no time during Dr. Gervin's testimony was a description or definition of his understanding of the phrase "standard of care" given. Dr. Arana's claims are without merit.

The Shefflers alleged two theories of negligence: (1) Dr. Arana performed the wrong surgery on June 16, 1993, a primary anastomosis rather than a colostomy, and (2) Dr. Arana failed to diagnose and treat Mrs. Sheffler's postoperative complications. Dr. Gervin first described the appropriate standard of care ordinarily exercised by a skillful and prudent physician in preparing a bowel for surgery and in performing a primary anastomosis. He instructed the jury that the standard of care precludes the performance of a primary anastomosis in conjunction with a resection if an infection or feces is found in the colon because the anastomosis would likely become infected and pull apart. He then opined that Dr. Arana failed to use the standard of care when he did not mechanically reduce the amount of feces in Mrs. Sheffler's colon with Golytely or a nonabsorbent antibiotic prior to surgery and that the environment in Mrs. Sheffler's colon necessitated a colostomy. He testified that Dr. Arana deviated from the standard by performing the anastomosis rather than the colostomy.

Dr. Gervin then described the applicable standard of care ordinarily exercised by a skillful and prudent physician in diagnosing and treating postoperative complications from a leaking anastomosis. He explained the numerous "red flags" that would alert a physician to a leaking anastomosis and described the corrective measures to be taken in the situation. Dr. Gervin then surmised that Dr. Arana did not exercise the appropriate standard when he failed to diagnose and treat the leaking anastomosis by June 29, nine days after Mrs. Sheffler began experiencing symptoms of the problem. Finally, Dr. Gervin testified that Dr. Arana's failure to perform a colostomy on June 16, 1993, and

his failure to promptly diagnose and treat the leaking anastomosis prolonged Mrs. Sheffler's hospitalization and suffering and caused her to incur unnecessary medical procedures, surgeries, and expenses.

Through the Shefflers' attorney's questions and Dr. Gervin's answers, which are considered in the context of those questions, the objective legal standard of care was articulated. Dr. Gervin framed his answers to indicate to the jury the degree of skill and learning ordinarily used by members of the health care profession in preparing bowels for surgery, performing an anastomosis, and diagnosing and treating postoperative complications from a leaking anastomosis. Dr. Gervin's answers indicated that the only proper conduct by Dr. Arana, considering the inadequate preparation of Mrs. Sheffler's bowels, would have been a colostomy and that Dr. Arana's performance of a primary anastomosis was below the acceptable conduct. He offered his opinion that Dr. Arana deviated from the standard of care ordinarily exercised by a skillful and prudent physician in his treatment of Mrs. Sheffler. If Dr. Arana believed that Dr. Gervin failed to answer the questions asked or that the range of acceptable conduct was more inclusive than that testified to by Dr. Gervin, Dr. Arana could have explored those issues on cross-examination of Dr. Gervin. Declining to inquire of Dr. Gervin on cross-examination about the required standard of care because of the belief that Dr. Gervin failed to state what the standard requires assumes some risk when, as is determined here, Dr. Gervin asserted the procedure required to satisfy the standard of care under the facts of this case. This evidence was sufficient to make a submissible case of medical negligence on both theories. Thus, the trial court properly denied Dr. Arana's motions for directed verdict and judgment notwithstanding the verdict and submitted verdict directing instruction No. 8. Points three, four, and five are denied.

The judgment of the trial court is affirmed.

All concur.