**MORGAN PUBLICATIONS, INC., et al., Appellant,**

v.

**SQUIRE PUBLISHERS, INC., et al., Respondent.**

**No. WD 55571.**

Missouri Court of Appeals, Western District.

April 18, 2000.

As Modified Aug. 1, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 2000.

Application for Transfer Denied Oct. 3, 2000.

Robert K. Ball, II, Kansas City, for appellants.

Robert B. Thomson, Kansas City, for respondents.

Before BRECKENRIDGE, C.J., LOWENSTEIN and ELLIS, JJ.

PATRICIA BRECKENRIDGE, Chief Judge.

Morgan Publications, Inc., and Patrick Morgan appeal the judgment they obtained against Squire Publishers, Inc., and

Thomas Leathers.[1] The jury found that Morgan Publications, Mr. Morgan, and his wife, Verna Morgan, were entitled to rescission of several contracts the parties had executed because of misrepresentations that Squire made during negotiation of the contracts. The jury awarded $1 each in damages to Morgan Publications and Mr. Morgan. The jury found against Squire on all counterclaims for breach of the contracts at issue and quantum meruit, and against the Morgans on their punitive damages claims. The trial court accepted the jury's verdicts and entered judgment in favor of the Morgans for $2 total damages.

The Morgans raise several issues on appeal. First, the Morgans contend that the trial court erred in overruling their objection to a portion of Squire's closing argument, and in not excluding, *sua sponte*, other comments Squire's counsel made during closing arguments. Second, the Morgans argue that the trial court erred in overruling their motion for a directed verdict on one of Squire's counterclaims and in submitting Squire's verdict-directing instruction on that counterclaim. Third, the Morgans complain that the trial court erred in failing to grant them a new trial on the issue of damages since the damages awarded are grossly inadequate. Finally, the Morgans claim that the trial court erred in failing to enter a judgment in their favor for rescission of the contracts and against Squire on all of Squire's counterclaims.

The judgment of the trial court is affirmed, as amended.

### Factual and Procedural Background

On appeal, this court reviews the facts in the light most favorable to the trial court's judgment. *Meyer v. Lofgren,* 949 S.W.2d 80, 82 (Mo.App.1997). While living in Texas in 1993, Patrick and Verna Morgan desired to own and operate a small independent newspaper, preferably in the Kansas City metropolitan region, where their family resided. With the assistance of a newspaper broker, Robert Bolitho, the couple learned that The Squire, a newspaper distributed in the Kansas City area, might be for sale. The Squire was published in Prairie Village, Kansas, by Squire Publishers, Inc., a Kansas corporation owned solely by Tom Leathers. In November of 1993, Mr. Morgan began negotiations with Mr. Leathers for the purchase of The Squire.[2] During the course of negotiations, Mr. Morgan requested numerous pieces of information from Mr. Leathers concerning the operation and finances of Squire Publishers. Mr. Morgan used this information in negotiations not only to determine what he considered to be a fair price for the newspaper operation, but also to determine whether he wanted to continue negotiations to purchase it. Of particular importance to Mr. Morgan was Squire Publishers' profit and loss history, and accounts payable and receivable. Some of the information Mr. Leathers provided Mr. Morgan induced Mr. Morgan to believe that while The Squire was operating at a loss in 1994, there was an improvement in sales over the 1993 figures.

After several months of negotiation, Mr. Morgan, Mr. Morgan's newly-formed Kansas corporation, Morgan Publications, Mr. Bolitho,[3] Squire Publishers, and Mr. Leathers agreed that Morgan Publications would purchase Squire Publishers' newspaper operation for the total purchase price of $600,000. The transaction required the signing of several contracts,

1. This court will refer to Morgan Publications, Inc., and Patrick Morgan collectively as "the Morgans," and Squire Publishers, Inc., and Mr. Leathers collectively as "Squire."

2. Squire Publishers actually published two newspapers, The Squire, its main paper, and The Squire's Other Paper. The sale of The Squire included the sale of The Squire's Other Paper.

3. Mr. Bolitho was a party to the agreement solely for the purpose of receiving a commission for brokering services he had provided to the Morgans.

including an asset purchase agreement, in which Morgan Publications agreed to purchase Squire Publishers' assets for $370,000. A portion of the sales price, $100,000, was due at closing, and Morgan Publications signed a promissory note to pay the remaining $270,000 over ten years. The promissory note was secured by a security agreement covering Squire Publishers' assets, and Mr. and Ms. Morgan signed a guaranty to be personally liable for the $270,000. Morgan Publications and Mr. Leathers signed an independent contractors' agreement, whereby Mr. Leathers agreed to act as a consultant to Morgan Publications and perform certain editorial duties for *The Squire*. Morgan Publications also agreed to lease the premises for the operation of Morgan Publications from Mr. Leathers. Morgan Publications was to pay the remaining $230,000 of the purchase price through the independent contractors' agreement and the lease agreement.[4]

In the asset purchase agreement, Morgan Publications agreed to become liable for and pay all outstanding accounts payable of Squire Publishers from the accounts receivable of the company. Squire Publishers agreed to transfer to Morgan Publications all accounts receivable as of the date of closing. At the closing on July 7, 1994, a dispute arose when Mr. Leathers did not produce a list of accounts payable and receivable current as of the day before closing, even though he had agreed to do so. Instead, Mr. Leathers represented to Mr. Morgan the total amounts for both the accounts receivable and payable, and he assured Mr. Morgan that the specific lists would be forthcoming. The parties then signed all of the contracts, and Mr. Morgan personally paid $70,000 of the $100,000 owed at closing.[5]

Shortly after the Morgans began operating *The Squire*, they discovered discrepancies in both the accounts receivable and payable. Specifically, the Morgans discovered that the newspaper owed additional accounts payable, and approximately $25,000 of the newspaper's accounts receivable were considered uncollectible because the debtors had closed their businesses, moved, filed for bankruptcy, or continuously refused to pay for a period of more than 120 days. When the Morgans complained, Mr. Leathers initially agreed to pay Morgan Publications half of the amount of the uncollectible accounts receivable. Mr. Leathers later told Mr. Morgan, however, that rather than write Morgan Publications a check, he would just wait ten years and deduct the amount of half of the uncollectible accounts receivable off of the unpaid balance due on the promissory note at that time. Mr. Morgan found this arrangement unacceptable. He and Mr. Leathers never resolved the issue.

In September of 1994, after the Morgans found discrepancies in the accounts payable and receivable, *The Squire's* bookkeeper provided the Morgans with financial figures which indicated that the newspaper's losses in the beginning of 1994 were significantly greater than what Mr. Leathers had represented during the purchase negotiations, while the newspaper's revenues were significantly less than Mr. Leathers had represented. The Morgans also learned that Squire had told advertising purchasers and trade publications that *The Squire's* circulation was 30,000 when, in reality, its circulation was 16,000. Because *The Squire's* advertising rates were

---

4. Morgan Publications also entered into an employment agreement with Mr. Leathers and Barbara Thomson, in which Morgan Publications agreed to continue Ms. Thomson's employment as managing editor of Morgan Publications' newspaper operation.

5. Ten thousand dollars of the amount to be paid at closing came from Mr. Morgan's fa-

ther, Joe Morgan, for which Joe Morgan received a 10% interest in Morgan Publications. The other $20,000 was structured to give Robert Bolitho a 10% interest in Morgan Publications in exchange for his commission, and to give Mr. Leathers a 10% interest in Morgan Publications in lieu of receiving cash.

based upon an inflated circulation figure, Mr. Morgan was concerned that advertising purchasers for *The Squire* might have a cause of action for fraud against Morgan Publications.

Upon discovering this information, Mr. and Ms. Morgan, Morgan Publications, and Mr. Bolitho filed suit against Squire Publishers and Mr. Leathers on September 29, 1994, asking that the court rescind of all the contracts signed in July and order Squire to pay compensatory and punitive damages.[6] After he was served with the petition, Mr. Leathers went to *The Squire's* offices, but Mr. Morgan initially refused to allow him to enter the building. Mr. Morgan eventually allowed Mr. Leathers to go to his office in the building, but a police officer later arrived and told Mr. Leathers to leave. On November 4, 1994, Mr. Morgan notified employees, columnists, and drivers for *The Squire* that publication of the newspaper would immediately cease, and he vacated *The Squire's* office building. Mr. Leathers was not allowed back into the building at that time. On November 9, 1994, Mr. Leathers' attorney delivered a Corrected Notice to Leave Premises to Mr. Morgan's attorneys. In a facsimile dated November 21, 1994, Mr. Morgan's attorney offered to tender back the assets and surrender the premises as directed by Mr. Leathers. Mr. Leathers regained possession of the furniture and equipment which formerly belonged to Squire and the office building on December 14, 1994.

Squire filed several counterclaims against the Morgans for breach of the asset purchase agreement, promissory note, security agreement, independent contractors' agreement, lease agreement; for quantum meruit based upon editorial and consulting services Mr. Leathers allegedly provided to Morgan Publications; and for quantum merit based upon Morgan Publications' exclusive use and possession of the office building from July 1, 1994 to December 1, 1994. A jury trial was held at the

end of September and first part of October, 1996. The jury returned a verdict in favor of the Morgans for rescission of all contracts and against Squire on all of their counterclaims. The jury awarded $1 in damages to Mr. Morgan and $1 in damages to Morgan Publications. Following the jury's award of $2 total damages, the court submitted the Morgans' claims for punitive damages against Mr. Leathers only, as the Morgans had not presented any evidence against Squire Publishers on the punitive damages issue. The jury awarded no punitive damages. The trial judge accepted the verdicts and ordered Squire to pay $1 in damages each to Mr. Morgan and Morgan Publications. The trial judge further ordered that Mr. Leathers pay no punitive damages to the Morgans. The trial court denied the Morgans' motion for additur, correction of the judgments or for new trial. The Morgans then filed this appeal.

### Choice of Law

Prior to considering the Morgans' claims of error, this court must first determine the applicable law. The law of the forum, Missouri, governs procedural issues, including the standard of review. *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 59 (Mo. App.1999). On the substantive issues, however, the contracts provide that Kansas law governs. The parties present no public policy issues in this case that would require the application of Missouri law over Kansas law. *See State ex rel. Geil v. Corcoran*, 623 S.W.2d 557, 559 (Mo.App. 1981). Therefore, this court will apply Kansas law to determine substantive issues.

### No Error in Squire's Closing Arguments

In their first point, the Morgans raise two claims of error regarding Squire's closing argument. "The trial court has broad discretion in determining

6. Mr. Bolitho's claims were not submitted to the jury, and he is not a party to this appeal.

the propriety of closing argument." *Sheffler v. Arana,* 950 S.W.2d 259, 265 (Mo. App.1997). Because the trial court is in a better position to determine the prejudicial effect of closing argument, an appellate court will not disturb the trial court's ruling unless it finds the trial court abused its discretion. *Id.* "Further, counsel is accorded wide latitude in arguing facts and drawing inferences from the evidence, and the law indulges a liberal attitude toward closing argument." *Rhodus v. Wheeler,* 927 S.W.2d 433, 437 (Mo.App.1996).

■ The Morgans first contend that the trial court erred in overruling their objection to opposing counsel's statement, "Is it right to enrich one person and ruin another under these disputed facts?" The Morgans claim that the comment is a misstatement of the law which appealed to the jury's sympathy and asked the jury to ignore the law and evidence. During the Morgans' closing argument, their counsel had asked the jury to award Morgan Publications $642,000 in damages to compensate Mr. Morgan for his losses resulting from Mr. Leathers' alleged misrepresentations.

■ Squire's counsel responded to the Morgans' request for $642,000 in damages by setting forth the facts Squire believed were in dispute. The comment at issue made by Squire's counsel was, in effect, a request to the jury not to make Squire pay the requested damages in light of those disputed facts. "[T]he law indulges a liberal attitude toward argument, particularly where the comment complained of is fair retort or responds to prior argument of opposing counsel." *Kelly by Kelly v. Jackson,* 798 S.W.2d 699, 704 (Mo. banc 1990). Given the context in which Squire's comment was made, it was a fair response to the Morgans' argument and was thus within the bounds of proper closing argument. The trial court did not abuse its discretion in overruling the Morgans' objection.

■ The Morgans further argue in this point that the trial court plainly erred in allowing the following comment by Squire's counsel:

> So what to do with this weighty decision? Well, some had a weighty decision. Solomon, he was given a baby and two mothers claimed that it was his – theirs. So one said, "Cut the baby in half and we'll give each a half baby," but the real mother said "I would rather have the baby live with the false mother than die that each of us have half." So what do we do here? What could be done here? You can determine who is to prevail, which side you believe. And you can put in your formal verdicts one dollar, one dollar for the prevailing party. Is that what someone would have done to save the child?

The Morgans did not object at trial to this argument. Accordingly, the Morgans ask this court to review for plain error pursuant to Rule 84.13(c). Rarely will comments made during closing argument rise to the level of plain error entitling a party to relief. *Long v. Twehous Contractors, Inc.,* 904 S.W.2d 285, 290 (Mo.App.1995). Plain error occurs in closing argument only if the "closing argument contains reckless assertions, unwarranted by proof and intended to arouse prejudice, which, therefore, may be found to have caused a miscarriage of justice." *Hensic v. Afshari Enterprises, Inc.,* 599 S.W.2d 522, 526 (Mo. App.1980).

The Morgans argue that the reference to King Solomon "added the sanction of God Almighty," and inflamed the passion and prejudice of the jury. This court interprets the comment by Squire's counsel, however, as nothing more than a recommendation to the jury that it could find in favor of the Morgans, but award them only nominal damages. While excessive references to God and the Bible in closing arguments are discouraged, the Morgans fail to demonstrate that Squire's isolated analogy to the story of King Solomon in making the argument for nominal damages caused the Morgans to suffer a manifest injustice or a miscarriage of justice. *See*

*State v. Phillips,* 940 S.W.2d 512, 519–20 (Mo. banc 1997); *State v. Whitfield,* 837 S.W.2d 503, 513 (Mo. banc 1992). The Morgans' first point is denied.

### No Error in Submitting Squire's Counterclaim to the Jury

■ In the Morgans' second point on appeal, they claim that the trial court erred in overruling their motion for directed verdict on Squire's counterclaim on the promissory note and guaranty, and in submitting to the jury Squire's verdict director on this counterclaim. The Morgans claim that the submission of the verdict director on Squire's counterclaim permitted the jury to consider awarding the Morgans significantly less than their real damages on their claims because they allegedly owed Squire under the promissory note and guaranty.

The jury returned a verdict in favor of the Morgans on Squire's counterclaim; thus, the Morgans are in no position to allege error in the court's overruling their motion for directed verdict and submitting the counterclaim to the jury. *Sooter v. Magic Lantern, Inc.,* 771 S.W.2d 359, 362 (Mo.App.1989). Moreover, in light of this court's finding in the next point that the damages award was not against the weight of the evidence, this court cannot say that the trial court's error, if any, in submitting the verdict director on Squire's counterclaim caused the Morgans to suffer any prejudice with regard to their claims for damages against Squire. The Morgans' second point is denied.

### The Morgans are not Entitled to Relief from the $2 Damages Judgment

In their third point, the Morgans ask that this court grant them relief from the $2 judgment for damages because they claim the damages are shockingly inadequate. The Morgans assert that they are entitled to relief for three reasons: (1) the judgment for damages is against the weight of the evidence; (2) the trial court abused its discretion in failing to grant their motion for a new trial on damages only; and (3) the trial court abused its discretion in failing to grant additur. In resolving these claims, Missouri law governs the applicable standards of review and procedural issues and Kansas law governs the nature of the cause of action and the relief available.

First, the Morgans' brief reveals that the standards of review upon which the Morgans base their three claims for relief are legally inconsistent. In arguing that the judgment is against the weight of the evidence, the Morgans assert that because this was an equitable cause of action, the jury's verdict was advisory only and the standard of review for a court-tried case governs. In their other two claims of error that the trial court abused its discretion in failing to grant a new trial on damages or additur, the Morgans rely on standards of review applicable to jury-tried cases.

■ Rescission is an equitable remedy. *See Nordstrom v. Miller,* 227 Kan. 59, 605 P.2d 545, 554 (1980). The Morgans assert on appeal that because rescission is an equitable remedy, the trial court, and not the jury, actually determined the damages award. In support of this claim, the Morgans cite *Edwards v. Maples,* 388 S.W.2d 850, 852 (Mo.1965), a case in which the Supreme Court described the nature of equity claims tried to a jury as follows:

> Equity cases are rarely tried to a jury. And in those rare instances where an issue is submitted to a jury the verdict is advisory only. The court may accept or reject the verdict and, if accepted, it is the court's own finding on the fact issue rather than that of the jury. On review of an equity case we consider the issues as having been determined by the court and are not bound by the finding of a jury.

The Morgans argue that, pursuant to *Edwards,* the jury's verdicts in this case were only advisory and, since the trial court chose to accept the jury's advisory ver-

dicts, this court should consider the damages award as if it had been determined by the court, and not the jury. This argument is made only in conjunction with their claim that the judgment for damages is against the weight of the evidence. When arguing that the trial court abused its discretion in failing to grant their motion for additur or a new trial, the Morgans present their claims of error as though the jury rendered its verdict in a non-equity context and that the standard of review of a jury's verdict in an action at law applies.

The Morgans' confusion regarding the nature of their cause of action and the proper procedures and law applicable was also apparent in the trial court. There, the Morgans identified their cause of action as rescission, but did not appear to recognize that it was an equitable cause of action. They proceeded as though they were trying an action at law, including offering jury instructions that would be given in the usual jury case. Although counsel for Squire, when arguing a motion for election of remedies, stated that the Morgans' claim was an equitable claim, his arguments on the issues raised by that motion were not an accurate statement of the law which warranted a ruling in Squire's favor. Nor did he object that the form of the proceedings were inconsistent with the trial of an equitable cause of action. Therefore, it is clear from the record that neither of the parties treated the jury as merely an advisory jury. Consistent with the parties' approach, the trial court did not try the case as an equitable action, since it submitted the cause to the jury on the instructions submitted by the Morgans, which is an indication that the court did not consider the jury to be advisory. *See Weltscheff v. Medical Center of Independence, Inc.*, 604 S.W.2d 796, 801 (Mo.App.1980). Nevertheless, it is not necessary for this court to determine the appropriate standard of review for an equitable action which was tried under the procedures applicable to a cause of action at law and whether the Morgans or Squire

waived any related claims of error since they invited the error, because the Morgans' claim that the trial court erred in entering a judgment for $2 total damages award is unsuccessful under either the standard of review in a court-tried case or the standard of review in a jury-tried case.

The first claim by the Morgans that they are entitled to relief from the judgment of $2 in damages is that the court-tried judgment is against the weight of the evidence. Appellate review of a court-tried judgment is that established in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Pursuant to this standard, this court affirms the trial court's damages judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* Under this standard, an appellate court sets aside a trial court's judgment as "against the weight of the evidence" only if it firmly believes that the judgment is wrong. *Id.*

The Morgans argue that the weight of the evidence establishes that they are entitled to a minimum of the return of their $80,000 down payment and consequential damages of at least $260,000, calculated to be the difference between the value of the business and assets they thought they had purchased and the value of that which they actually received. Their measure of consequential damages is inconsistent and incompatible with the remedy of rescission, however. *See Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 664 P.2d 813, 819 (1983). While a claim for damages based upon the difference between what a party received pursuant to the contract and what the party should have received affirms the contract, a claim for rescission "seeks restoration of the status existing before the sale was completed" and, therefore, disaffirms the contract. *Id.* Because "[r]esort to one excludes a party from resorting to the other," *id.*, the Morgans were not entitled to both rescission and damages based upon

the alleged difference in the values of what they thought they were purchasing and what they actually received.

■ The Morgans assert, however, that Kan. Stat. Ann. § 84–2–721 (1996), allows them both remedies because their claim for rescission was based upon Squire's fraudulent and material misrepresentations. Section 84–2–721 is found in Article 2 of the Uniform Commercial Code (U.C.C.) as adopted by Kansas, and provides as follows:

> Remedies for material misrepresentation or fraud include all remedies available under this article for nonfraudulent breach. Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy.

Article 2 of the U.C.C. applies to transactions in goods. Kan. Stat. Ann. § 84–2–102 (1996). Article 2 defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action." Kan. Stat. Ann. § 84–2–105(1) (1996).

The transaction in this case was the sale of an ongoing newspaper business and its assets. Some of the assets transferred by Squire to the Morgans pursuant to the parties' asset purchase agreement were Squire's movable furniture and equipment, which constitute "goods" under Kan. Stat. Ann. § 84–2–105(1) (1996). Where the sale of an ongoing business involves the sale of both goods and non-goods, "a ma-

jority of courts apply Article 2 only if the 'predominant purpose' of the whole transaction was a sale of goods, and in that event, the majority applies Article 2 to the whole" transaction. JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE, § 1–1, at 4 (4th ed.1995). The predominant purpose test has been articulated as follows:

> Rather than a view of mechanical technicality or of mathematical nicety, a view of the reasonable totality of the circumstances should control the characterization of the contract for sale. If, viewed as a whole, it can be concluded that the essential bulk of the assets to be transferred qualify as "goods", then it is appropriate to consider the transaction a "contract for the sale of goods."

*De Filippo v. Ford Motor Company*, 516 F.2d 1313, 1323 (3d Cir.1975).[7]

In cases where the value of the goods sold far outweighed the value of assets not classified as goods, or where the majority of the terms of the contract concerned the sale of the goods, courts have applied the predominant purpose test and found that Article 2 governed the transactions. *See Cianbro Corp. v. Curran–Lavoie, Inc.*, 814 F.2d 7, 13–14 (1st Cir.1987) (holding that Article 2 governed the sale of a construction company's equipment, inventory, and uncompleted construction contracts where "most of the significant terms" and ninety-eight percent of the purchase price related to the sale of goods); *De Filippo*, 516 F.2d at 1323 (finding that Article 2 governed the sale of an automobile dealership where the value of the goods (equipment and inventory) sold was well in excess of three times the value of the accounts receivable,

---

7. In cases concerning other "hybrid" transactions such as those involving both the sale of goods and the sale of services, Kansas courts, and courts applying Kansas law, determined what the predominant factor in the transactions was to decide whether Article 2 applied. *See, e.g., Hope's Architectural v. Lundy's Const., Inc.*, 781 F.Supp. 711, 713 (D.Kan. 1991), *aff'd*, 1 F.3d 1249 (10th Cir.1993); *Care Display, Inc. v. Didde–Glaser, Inc.*, 225 Kan. 232, 589 P.2d 599, 605 (1979); *Systems*

*Design v. Kansas City Post Office*, 14 Kan. App.2d 266, 788 P.2d 878, 881–82 (1990). In that context, the courts considered whether the main purpose or thrust of the transaction " '[wa]s the rendition of service, with goods incidentally involved … or [wa]s a transaction of sale, with labor incidentally involved....' " *Care Display*, 589 P.2d at 605 (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir.1974)).

which was the only non-goods asset sold, and where the "title to no real estate was to pass in the transaction, nor was any value assigned for good will or the value of the business as a going concern.").

In cases where the transactions involved the transfer of a significant amount of intangibles, however, courts have applied the predominant purpose test and found that the sale of goods was merely incidental to the transaction and, therefore, Article 2 did not govern. *See Fink v. DeClassis,* 745 F.Supp. 509, 515–16 (N.D.Ill.1990) (finding that Article 2 did not govern the sale of a company's beauty care product lines where the goods (machinery, equipment, and inventory) constituted only seventeen percent of the purchase price, which also included such intangible assets as "tradenames, trademarks, logos, advertising, artwork, customer lists, sales records, unfulfilled sales orders, goodwill, and licensing agreements."); *D.G. Porter, Inc. v. Fridley,* 373 N.W.2d 917, 923–24 (N.D. 1985) (holding that Article 2 did not apply to the sale of a bar business where, although the transaction included the transfer of such goods as furniture, equipment, and inventory, the essential elements of the sale and the focus of the litigation were the sale of goodwill, the transfer of the liquor license, "the assignment of the lease of the business premises, the transfer of fixtures, and the transfer or assignment of insurance policies and other contracts related to the business."); *Hudson v. Town & Country True Value,* 666 S.W.2d 51, 53–54 (Tenn.1984) (finding that the sale of an ongoing hardware business, which included the formation of separate contracts transferring the real estate of the business and the stock and fixtures of the business, was a single transaction, and was reasonably characterized as a "predominantly a non-goods sale" because the sale of the business was contingent on the sale of the real estate and the value of the real estate exceeded the value of the goods sold).

Applying the predominant purpose test to the facts of this case, the asset purchase agreement, which contained the provisions transferring Squire's furniture and equipment, constituted $370,000, or a little over half of the $600,000 purchase price. The asset purchase agreement provided for more than just the transfer of goods, however. The asset purchase agreement additionally provided for the transfer of non-goods, including the transfer to Morgan Publications of Squire's circulation list, the assignment to Morgan Publications of all of Squire's accounts receivable subject to its accounts payable, the assignment to Morgan Publications of Squire's trade names, trademarks, and copyrights, and Morgan Publications' agreement to assume and fulfill Squire's contract for a postage meter. The asset purchase agreement also contained non-competition and non-disclosure covenants. The Morgans were to pay $150,000 in addition to the $370,000 as consideration for those covenants.

Moreover, the sale of the Squire's newspaper business and assets to the Morgans involved the formation of several other contracts besides the asset purchase agreement. The asset purchase agreement was conditioned upon the execution of a lease agreement, by which the Morgans agreed to lease the premises for the newspaper operation from Mr. Leathers. The parties also executed an independent contractors' agreement, whereby Mr. Leathers was to act as a consultant to Morgan Publications and perform editorial duties for *The Squire.* Because the several contracts were executed in the course of the same transaction, they are to be construed together, and "the general purpose of the entire transaction should control." *Place v. Place,* 207 Kan. 734, 486 P.2d 1354, 1358 (1971).

Construing them together, the contracts comprising the sale indicate that the general purpose of the transaction in this case was much more than just the sale of Squire's furniture and equipment. This finding is confirmed by the testimony of one of the Morgans' own witnesses. At trial, the Morgans called Randall Batta-

gler, the general manager of three local newspapers, to testify regarding his assessment of the value of Squire's newspaper operation and assets. Mr. Battagler testified that the amount of "hard assets," i.e., the goods, was "really not that great," because "[i]t only takes a few computers and desks to put out a newspaper." Mr. Battagler stated that the purchaser of a newspaper business is mostly buying "the past history of the company, the good will that it's developed in the neighborhoods and the communities and the integrity that that company has with its various advertisers." In light of this testimony, and the significant amount of intangibles or non-goods included within the sale of Squire's newspaper business and assets to the Morgans, this court cannot say that the predominant purpose in this transaction was the sale of goods under Kan. Stat. Ann. § 84–2–105(1) (1996). Therefore, Kan. Stat. Ann. § 84–2–721 (1996) does not apply. The Morgans are thus limited in their relief to that available in rescission, which does not include consequential damages measured by the difference between the value of the business and assets they thought they had purchased and the value of that which they actually received.

The purpose of rescission is to return the parties to the status quo. *Dreiling v. Home State Life Insurance Co.*, 213 Kan. 137, 515 P.2d 757, 766 (1973). The Morgans argue that a return to the status quo would require, at a minimum, a judgment for their $80,000 down payment because the evidence was uncontradicted that they paid $80,000 in cash at closing. A finding that rescission is appropriate, however, does not require that the court restore the parties absolutely and literally to their former condition. *Id.* at 767. Rather, it is sufficient if the court effect such a restoration as is reasonably possible. *Id.* A court, sitting in equity, may " 'administer such relief as the nature, rights, facts, and exigencies of the case demand at the close of the trial or at the time of the making of the decree.' " *Baker*

*v. Tucker*, 227 Kan. 86, 605 P.2d 114, 118 (1980) (quoting 27 Am.Jur.2d § 249 Equity).

In this case, the Morgans agreed to pay $600,000 for Squire's newspaper operation and assets, and paid $80,000 in cash toward the asset purchase agreement at the time of closing. By the Morgans' own evidence, they purchased more than just Squire's furniture and equipment, which is what the parties referred to as the "hard assets." Rather, the Morgans also purchased an ongoing newspaper operation and all of the intangibles, such as goodwill, that came with it. After they filed their petition to rescind the contracts, however, the Morgans tendered back only the hard assets to Squire. Before tendering back the hard assets, Mr. Morgan notified all employees, columnists, and drivers for *The Squire* that the newspaper operation was ceasing and he denied Mr. Leathers access to the office building. After ceasing operation of the business, Mr. Morgan then waited over four more weeks before actually surrendering the office building to Squire. While the hard assets were present when Squire retook the office building, the Morgans did not tender back to Squire an ongoing newspaper operation. The Morgans' own witness testified that the hard assets in this case would "not be worth that much."

Generally, "one who seeks to rescind a contract, or to have equity rescind it, must place the other party in substantially the same condition he was in when the contract was executed." *Dreiling*, 515 P.2d at 766. By restoring to Squire only the hard assets and not the ongoing newspaper operation, the Morgans did not place Squire back in substantially the same condition as existed at the time of the making of the contracts. The Morgans had a duty to "do equity," that is to prevent waste by maintaining the newspaper operation until the tender occurred. *Nordstrom*, 605 P.2d at 554. The Morgans did not do so. Because the Morgans did not tender back an ongoing newspaper

operation to cease, it was impossible for the trial court to place Squire back in substantially the same condition; thus, it would have been inequitable for the court to have done so for the Morgans. By awarding a total of $2 in nominal damages to the Morgans, the trial court was fashioning a remedy that was "effect[uating] a just, fair, and equitable disposition of the case." *Baker*, 605 P.2d at 119. This court is not firmly convinced that the trial court's remedy was wrong. Therefore, pursuant to the standard of review for a court-tried case, this court finds that the $2 damages judgment is not against the weight of the evidence.

■■■■ The next two claims of error raised by the Morgans in their third point apply the standard of review in a jury-tried case. This court will first address the Morgans' claim that the trial court erred in denying them a new trial on the issue of damages. An appellate court will reverse the trial court's decision to deny a new trial on the basis of the inadequacy of the jury's damages award only if it finds that the trial court abused its discretion. *Norris v. Barnes*, 957 S.W.2d 524, 527 (Mo.App.1997). An abuse of discretion occurs only if the jury's "verdict is so shockingly inadequate as to indicate that it is a result of passion and prejudice or a gross abuse of its discretion." *Leasure v. State Farm Mut. Auto. Ins. Co.*, 757 S.W.2d 638, 640 (Mo.App.1988). Moreover, "[t]he size of the jury award alone does not establish that it resulted from bias or passion." *Norris*, 957 S.W.2d at 527. Rather, the party asserting a verdict's inadequacy must "show that some trial error or misconduct of the prevailing party was responsible for prejudicing the jury." *Id.* at 528. The Morgans do not demonstrate any trial error or misconduct by Squire that prejudiced the jury, causing it to award the Morgans only $2 in damages. Nor do the Morgans demonstrate that the verdict was a result of a gross abuse of the jury's discretion. The trial court, therefore, did not abuse its discretion in refusing to grant the Morgans a new trial.

The Morgans also claim that the trial court erred in failing to grant their request for additur. In their post-trial motion for additur, correction of the judgments or a new trial, the Morgans requested additur in the amount of $80,000 plus interest accrued since the filing of the petition on Mr. Morgan's claims against Squire, and $400,000 or $600,000 on Morgan Publications' claims against Squire.

■■■■ The doctrine of additur provides that the trial court "may increase the size of a jury's award if the court finds that the jury's verdict is inadequate because the amount of the verdict is less than fair and reasonable compensation for plaintiff's injuries and damages." § 537.068, RSMo 1994. "The purpose of additur ... is to correct a jury's honest mistake in ascertaining damages." *Norris*, 957 S.W.2d at 528. To grant additur, the trial court must find that a new trial is required "unless the defendant consents to increasing the judgment." *Tucci v. Moore*, 875 S.W.2d 115, 116 (Mo. banc 1994). This court will not disturb the trial court's ruling unless the verdict is so inadequate " 'that it shocks the court's conscience and convinces the court that both the jury and the trial judge abused their discretion.' " *Norris*, 957 S.W.2d at 528 (quoting *Elfrink v. Burlington Northern R.R. Co.*, 845 S.W.2d 607, 614 (Mo.App. 1992)). Having just found that the trial court did not abuse its discretion in denying the Morgans' motion for a new trial, we likewise find that the trial court did not abuse its discretion in denying their request for additur. Under the standard of review for either a jury-tried or court-tried case, the Morgans fail to establish they are entitled to relief from the damages judgment of $2. The Morgans' third point is denied.

### Trial Court's Failure to Make a Formal Entry of Judgment Does Not Require a New Trial

In their final point, the Morgans claim the trial court erred in failing to enter a

judgment in their favor on the claim of rescission and against Squire on all counterclaims.[8] Because of this error, the Morgans ask this court to enter these judgments and modify the $2 damages judgment because it was against the weight of the evidence.

In its judgment, the trial court set out in detail all of the jury verdicts, including the jury verdicts in favor of the Morgans on the claim of rescission, and the jury verdicts in favor of the Morgans on all counterclaims. The trial court then accepted the verdicts and entered judgment accordingly. The trial court did not specifically state that it found in favor of the Morgans on their claims of rescission and on all of Squire's counterclaims.

 A judgment alleged to be ambiguous is construed in the same manner as a written instrument. *Mallams v. Mallams*, 861 S.W.2d 822, 824 (Mo.App.1993). The court's intention is to be determined from considering the judgment as a whole. *Id.* The trial court's intent to accept the jury's verdicts on the claim for rescission and the counterclaims is apparent from the face of the judgment.

Nevertheless, to make it abundantly clear, this court amends the judgment, pursuant to Rule 84.14, to contain a formal entry of judgment (1) in favor of Verna Morgan and against Squire Publishers, Inc., on Ms. Morgan's claim for rescission of her promissory note guaranty; (2) in favor of Morgan Publications, Inc., and against Thomas Leathers and Squire Publishers, Inc., on Morgan Publications' claim for rescission and damages; (3) in favor of Patrick Morgan and against Thomas Leathers and Squire Publishers, Inc., on Mr. Morgan's claim for rescission and damages; (4) in favor of Morgan Publications, Inc., on Squire Publishers' counter-

claim on the promissory note, and in favor of Patrick Morgan and Verna Morgan on Squire Publishers' counterclaim on the guaranty; (5) in favor of Morgan Publications, Inc., and against Thomas Leathers on Mr. Leathers' counterclaim on the independent contractors' agreement; (6) in favor of Morgan Publications, Inc., and against Thomas Leathers on Mr. Leathers' counterclaim on the lease agreement; (7) in favor of Thomas Leathers and against Morgan Publications, Inc., on Morgan Publications' claim for punitive damages; and (8) in favor of Thomas Leathers and against Patrick Morgan on Mr. Morgan's claim for punitive damages. Having made this formal entry, this court notes that such an entry does not afford the Morgans the additional damages they also request in this point, as this court has already rejected the Morgans' claim that the $2 damages judgment was against the weight of the evidence. Thus, this court grants the Morgans' fourth point, but only for the limited purpose of correcting the trial court's judgment to include a formal entry of judgment in accordance with the jury's verdicts on all claims and counterclaims.

The judgment of the trial court is affirmed, as amended.

All concur.

---

8. In the argument following their fourth point, the Morgans also ask for attorney's fees they incurred because of the transaction with Squire and the subsequent litigation. The Morgans, however, did not properly raise a request for attorney's fees in their point relied on. "Errors raised for the first time in the argument portion of the brief and that are not raised in the point relied on need not be considered by [this court]." *Vallejo–Davila v. Osco Drug, Inc.*, 872 S.W.2d 511, 515 (Mo. App.1994).