FRANCOIS, Respondent, v. MOKROHISKY, M.D., and another, Appellants: BOERSMA, M.D., Defendant.

*No. 426. Argued February 3, 1975.—Decided March 6, 1975.*
(Also reported in 226 N. W. 2d 470.)

For the appellant John R. Mokrohisky, M.D., there was a brief by *Hanaway, Ross & Hanaway* of Green Bay, and oral argument by *Charles T. Hanaway*.

For the appellant William Stoll, M.D., there was a brief by *Everson, Whitney, Everson, Brehm & Pfankuch, S. C.* of Green Bay, and oral argument by *James L. Everson*.

For the respondent there was a brief by *Habush, Gillick, Habush, Davis & Murphy* of Milwaukee, and oral argument by *Robert L. Habush*.

HEFFERNAN, J. This is a medical malpractice case in which the jury found Drs. Boersma, Mokrohisky, and Stoll negligent in the diagnosis of the illness of James Francois as gallstones and for the performance of subsequent surgery, which revealed a healthy gallbladder and no gallstones. Damages for loss of earnings, hospital and medical expenses, and for personal injury were awarded. The verdict was approved by the trial judge, and judgment was entered.

The question presented is whether a verdict for malpractice based on a *res ipsa loquitur* can be sustained in the absence of medical testimony establishing a standard of care when the surgery failed to reveal the diagnosed

condition and showed that the gallbladder, which the physicians thought was diseased, was free of gallstones or other pathology.

We conclude that, in this surgical malpractice case involving an erroneous diagnosis, where there was no expert testimony, the doctrine of *res ipsa loquitur* does not apply. A jury of laymen does not have the knowledge to conclude that this surgery, which showed an incorrect diagnosis, could only have been the result of negligence. There was no evidence that any of the defendant physicians failed to exercise the appropriate standard of care. The verdict of the jury and the post-verdict order and judgment of the trial judge must be reversed and the cause remanded to the trial court, with directions to dismiss the complaint.

James Francois first visited Dr. Boersma in 1963. At that time Francois had symptoms of nausea and upper abdominal cramps. He vomited blood that had the texture and appearance of coffee grounds. He was examined at St. Vincent Hospital to determine whether the condition was caused by a stomach ulcer. An ulcer was ruled out, and a diagnosis of "acute gastro-enteritis" was made. There were no symptoms in 1963 that were associated with possible gallbladder pathology.

Francois again saw Dr. Boersma in 1967, when he again had severe abdominal pains and bouts of vomiting of a coffee-grounds-like substance. He was again admitted to the hospital for diagnosis. Because at this time there was a tenderness in the region of the gallbladder, a study of that organ was ordered by Dr. Boersma and undertaken by Dr. Mokrohisky. Francois was admitted to the hospital with a tentative diagnosis of "possible bleeding ulcer." Upon discharge, the diagnosis was changed to "probable gallstones."

At trial, Dr. Boersma testified that Francois had some, but not all, of the classical signs and symptoms of gallbladder trouble.

During hospitalization, Dr. Mokrohisky performed an X-ray examination of Francois' gallbladder. He testified that in gross cases of gallstones, three X rays are usually sufficient. In Francois' case, however, he took 30 pictures. He reported his findings to Dr. Boersma:

"There are multiple filling defects seen within the gall bladder. The defects were demonstrated on both the routine films and also on the post fatty meal films. The findings are compatible with gall stones. Conclusions: Gall stones."

At trial, he testified that he saw six to 12 gallstones. On the basis of Dr. Mokrohisky's report and the compatibility of some signs and symptoms with gallbladder trouble, Dr. Boersma recommended elective surgery.

Francois was told that the X rays showed gallstones and that treatment could be either a low-fat gallbladder diet or surgery. Francois elected surgery and accepted the recommendation of Dr. Boersma's office that Dr. Stoll perform the surgery.

At trial, Dr. Stoll stated that all of Francois' symptoms were not typical of gallbladder. He, however, made an examination of Francois and talked with him the evening before the surgery. He stated that he would not have operated were it not for the X-ray findings of the presence of gallstones, but he relied on his own judgment also.

When surgery was performed on February 8, 1968, Dr. Stoll found a healthy gallbladder, free of any stones. He closed the incision and left the gallbladder intact.

There was some testimony at trial that, were there stones in the gallbladder, they might have dissolved or passed from the body. The patient's history, however,

did not reveal any painful episodes that could be related to the passing of any stones. There was also evidence that, in some cases, mucosal folds in the lining of the gallbladder can be mistakenly identified as gallstones.

Dr. Mokrohisky testified that what he saw were gallstones and testified to a reasonable degree of medical certainty that the stones had either dissolved or were passed in the interim between the X-ray examination and the surgery. He stated that he had never mistakenly identified mucosal folds as gallstones.

Two radiologists were called as medical witnesses to review the X rays.

Dr. Edelblute testified:

"I don't think the findings are completely definite for an examination of a single date; however, with some 30 projections, it was my impression that there are probably stones present."

Dr. McManus testified:

". . . it was my feeling that there were apparent gall stones within the gall bladder on that study on this particular day in December, 1967."

Under this state of the record, we conclude that there was no expert medical testimony to show that any of the physicians had failed to conform to a proper standard of care. That standard was stated in *Shier v. Freedman* (1973), 58 Wis. 2d 269, 283, 284, 206 N. W. 2d 166, 208 N. W. 2d 328:

"[A] qualified medical (or dental) practitioner, be he a general practitioner or a specialist, should be subject to liability in an action for negligence if he fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances."

The burden to prove negligence was on the plaintiff, and there was no testimony by any medical expert to

show an appropriate standard of care or a breach of that standard.

True, there was evidence that other physicians might have acted differently and that there were alternate procedures available, but no physician testified that what was done did not comport with approved medical practice under the circumstances. As we said in *Trogun v. Fruchtman* (1973), 58 Wis. 2d 569, 584, 207 N. W. 2d 297:

> "[A] plaintiff must prove the defendant failed to give him, not the highest degree of care, but merely the reasonable care and skill usually possessed by physicians of the same school . . . ."

A physician is not an insurer of the results of his diagnosis or procedures. He is obliged to conform to the accepted standard of reasonable care, but he is not liable for failing to exercise an extraordinary degree of care.

True, physicians too often have attempted to encourage the aurae of an infallibility they do not possess. Theirs is not an exact science, and even the very best of them can be wrong in diagnosis or procedure. The question, however, is not whether a physician has made a mistake; rather, the question is whether he was negligent. Unless the untoward result was caused by the failure to conform to the accepted standard of care, he is not liable in negligence for damages.

Members of the medical profession who have held themselves out to be supermen should not be surprised that laymen take them at their word and impose superdamages. The law, however, recognizes the medical profession for what it is—a class of fallible men, some of whom are unusually well-qualified and expert and some of whom are not. The standard to which they must conform, however, is determined by the practices of neither the very best nor the worst of the class. Like automobile drivers, engineers, common laborers, and lawyers,

they are obliged to conform to reasonable care in the circumstances.

The case was submitted to the jury under the principles of *res ipsa loquitur*. The applicability of the *res ipsa* doctrine to medical malpractice cases was decided in *Fehrman v. Smirl* (1963), 20 Wis. 2d 1, 27, 121 N. W. 2d 255, 122 N. W. 2d 439.

In *Fehrman,* we said that the doctrine was applicable and could be invoked in medical malpractice cases when a layman is able to say, either as a matter of common knowledge or on the basis of expert medical testimony, that the consequences of professional treatment are not those which would ordinarily result if due care is exercised. We also held that the mere rarity of an untoward result does not raise an inference that can form the basis of a *res ipsa* instruction.

In *Knief v. Sargent* (1968), 40 Wis. 2d 4, 161 N. W. 2d 232, the necessity of expert medical testimony in the usual malpractice case was discussed. The usual standard was applied and approved. That case held that the doctrine of *res ipsa:*

". . . may be applied to malpractice cases where expert medical testimony establishes the injury or the disease is of a kind which does not ordinarily occur if the doctor exercises due care." ( P. 6)

There was no medical testimony that would support a *res ipsa* instruction in this case. In *Fehrman,* it was pointed out, however, the doctrine of *res ipsa* was also applicable in a medical malpractice case when laymen could say as a matter of common knowledge that the consequences of professional care are not those that would result in the absence of negligence.

Is it a matter of common knowledge among laymen that the performance of a gallbladder operation which reveals no gallstones or gallbladder pathology ordinarily could only have occurred as the result of a lack of due

care in diagnosis? To so say would be to postulate that due care would in all cases result in an error-free diagnosis—that the exercise of due care would have infallibly revealed the absence or presence of gallstones.

The trial judge, however, did not place his *res ipsa* instruction on the common knowledge of jurors. He implicitly concluded that a *res ipsa* instruction in this case could be based only on the expert medical testimony.

While we disagree with the trial judge's conclusion that the medical testimony supported the *res ipsa* instruction, it is also clear that this is not a case in which laymen should be permitted to speculate. No layman could conclude that a mistaken diagnosis ordinarily would not be made but for want of due care.

In *Beaudoin v. Watertown Memorial Hospital* (1966), 32 Wis. 2d 132, 145 N. W. 2d 166, the patient received surgical care for a vaginal polyp. After surgery, it was found that she had sustained severe burns to the area of the buttock folds. This court held that *res ipsa loquitur* could be applied in that case because:

". . . a layman is able to conclude as a matter of common knowledge that blisters in the nature of second-degree burns in an area not directly related to the operative procedures do not ordinarily result if due care is exercised." (P. 138)

*Beaudoin* also refers to a California case where laymen's common knowledge was sufficient to conclude that, except for negligence, a shoulder would not be injured during the course of an appendectomy. *Ybarra v. Spangard* (1944), 25 Cal. 2d 486, 154 Pac. 2d 687.

It is not contended here that any negligence took place during the course of the surgery or that the surgical techniques employed were inappropriate for the condition diagnosed.

In many cases, surgical misadventures may well raise the inference of negligence in the minds of laymen of or-

dinary knowledge. Certainly, the leaving of a sponge or an instrument in an incision might well fall within that category. The erroneous removal of the wrong organ or bodily part contrary to a correct pre-operative diagnosis would be a result that would not, to the mind of a layman, occur in the absence of negligence.

The accuracy of diagnosis of gallbladder pathology is not a matter of common knowledge, and no expert testimony was adduced that could lead to a reasonable inference that a misdiagnosis was probably the result of negligence.

We have examined the record in regard to each of the defendant physicians. There was no evidence, circumstantial or direct, that would have permitted this case to go to the jury. The complaint must be dismissed for want of sufficient proof.

*By the Court.*—Judgment reversed, and cause remanded with instructions to dismiss the complaint.