NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 5, 2010[*]
Decided May 5, 2010

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

JOHN L. COFFEY, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 09-2944

| | |
|---|---|
| RALPHFIELD HUDSON, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Western District of Wisconsin. |
| | |
| *v.* | No. 07-cv-355-bbc |
| | |
| UNITED STATES OF AMERICA, | Barbara B. Crabb, |
| *Defendant-Appellee.* | *Judge.* |

### O R D E R

In this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, Ralphfield Hudson claims that the negligence of prison medical staff in changing the dosage of his medication caused him to have a seizure. Hudson lost at summary judgment

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

when he failed to produce expert testimony about the applicable standard of care for treating a seizure disorder. Hudson appeals, contending that expert testimony is unnecessary. We affirm the judgment.

When Hudson was transferred to the federal prison in Oxford, Wisconsin, he had a prescription from a doctor at his previous prison for 260 mg of phenytoin, an anti-seizure drug. In his complaint Hudson alleges that the prison pharmacist at Oxford cut the dosage to 200 mg because the pharmacy did not have the correct pills in stock and the pharmacist refused to order them. According to Hudson, the reduced dosage did not control his seizure disorder, and two months later he had a seizure that resulted in a head injury, ongoing memory loss, and numbness on his right side.

The parties began discovery, but after Hudson did not disclose any expert witnesses by the deadline, the United States moved for summary judgment. It argued that Hudson could not prevail at trial without an expert to establish the applicable standard of care. The United States attached an affidavit from the prison pharmacist explaining that when Hudson arrived at Oxford the pharmacy stocked only 100 mg capsules of phenytoin and nothing smaller. Therefore, according to this hearsay account, a physician assistant lowered Hudson's dosage to 200 mg. The pharmacist added that it was safer to reduce the dosage than to increase it to 300 mg because phenytoin can be harmful in high doses. Five weeks later, she continued, a blood test revealed that the serum concentration of phenytoin in Hudson's blood was 9 mcg/mL, slightly below the optimum range of 10 to 20 mcg/mL. She explained that Hudson remained on 200 mg because some patients achieve seizure control at lower serum concentrations and he had been seizure-free for the past month on the lower dosage. But then less than four weeks after the blood test, the pharmacist continued, Hudson suffered a seizure, so the dosage was raised to 300 mg by a physician assistant. Another round of blood tests proved that dosage to be too high, so it was returned to the initial 260 mg, and the pharmacy ordered 30 mg capsules to fill the prescription. At that dosage, Hudson's serum concentration stayed within the 10 to 20 mcg/mL range, and he remained seizure-free through the writing of the affidavit, three years later. The United States, relying on Wisconsin law, contended that Hudson needed expert testimony to prove that lowering the dosage by 60 mg violated the standard of care in treating a seizure disorder. The government argued that a layperson would not know the effect of changing the dosage.

Hudson responded that he did not need to provide an expert witness because he believed that the pharmacist's own testimony established a breach of the standard of care. The pharmacist acknowledged that one of her duties is "to ensure that proper laboratory monitoring is being performed," and she also conceded that a medical professional should never assume that a serum concentration within 10 to 20 mcg/mL is either safe or effective.

Hudson argued based on the first statement that the pharmacist was negligent when she failed to ensure that lab tests had been done before his medication was changed. And he asserted that her explanation that 200 mg was a safer initial dose than 300 mg contradicted her assertion that one should never assume a particular serum concentration is safe or effective.

The district court granted summary judgment for the United States. The court recognized that Wisconsin law governs substantive issues in this malpractice action. *See* 28 U.S.C. § 1346(b)(1); *Gil v. Reed*, 535 F.3d 551, 557 (7th Cir. 2008). But while expressing reservations, the court also followed the government's lead in assuming that Wisconsin evidentiary standards define the need for expert testimony. The court rejected Hudson's argument that the pharmacist's affidavit evidenced the standard of care. The court reasoned that, although the pharmacist was responsible for ensuring that followup laboratory analysis was done for medications she dispensed, that task did not establish that testing was mandated before Hudson's dosage could be changed. Similarly, the court concluded that information about evaluating the efficacy or safety of a particular serum concentration is unrelated to the standard a medical professional should use when deciding on a dosage without the benefit of a known serum concentration. The court reasoned that Wisconsin law requires expert testimony about the standard of care unless the doctrine of res ipsa loquitur applies. But the court concluded that res ipsa loquitur was inapplicable here because there was no obvious mistake like removing the wrong body part or leaving a foreign object in a body during surgery. It followed, the court reasoned, that expert testimony was needed to educate jurors about the appropriate procedure for prescribing phenytoin.

On appeal Hudson initially complains that the district court did not recruit counsel to represent him. But Hudson did not ask the district court for a lawyer until after judgment had been entered for the United States, and we have not held that a district court is required to assess the need for counsel sua sponte. *Cf. Pruitt v. Mote*, 503 F.3d 647, 657-58 (7th Cir. 2007) (en banc) (concluding that district court does not have ongoing duty to monitor indigent civil litigant's competence to try case).

Hudson principally contends that Wisconsin courts would not demand expert testimony because, in his view, the occurrence of a seizure soon after the dosage was lowered is reason enough for a layperson to conclude that the medical staff at Oxford was negligent. The government takes the opposite view, but the parties' focus on Wisconsin law is problematic because an expertise requirement grounded in state law does not trump the federal rules of evidence even in FTCA cases. *See Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004); *Ueland v. United States*, 291 F.3d 993, 998 (7th Cir. 2002). We have not decided whether Wisconsin's expertise rule imposes a higher burden on litigants than the federal

rules, *see Gil*, 535 F.3d at 558 n.2, but neither party has briefed the issue, and nothing turns on the distinction, if any. Even if there is no requirement of expert testimony to establish the standard of care, it is clear that an unfavorable result from treatment will not alone raise an inference of substandard care. *Nowatske v. Osterloh*, 543 N.W.2d 265, 274-75 (Wis. 1996); *Francois v. Mokrohisky*, 226 N.W.2d 470, 472-73 (Wis. 1975). To get past summary judgment Hudson needed to present evidence that the manner in which his phenytoin prescription was altered from 260 mg to 200 mg fell below the applicable standard of care and that the decrease was a cause of his seizure. *See Carney-Hayes v. Nw. Wis. Home Care, Inc.*, 699 N.W.2d 524, 537 (Wis. 2005). He cannot rely on res ipsa loquitur as a substitute for evidence of substandard care because that doctrine adds nothing when "the plaintiff's evidence may conclusively establish the sequence of events" that caused the injury. RESTATEMENT (THIRD) OF TORTS § 17 cmt. g.; *see Lambrecht v. Estate of Kaczmarczyk*, 623 N.W.2d 751, 764 & n.27 (Wis. 2001); *Turtenwald v. Aetna Cas. & Sur. Co.*, 201 N.W.2d 1, 5-6 (Wis. 1972). In this case, Hudson has taken the position that the negligent act was lowering his established dosage in order to avoid buying pills that were not in stock, and having defined his negligence theory in that manner he cannot rely on the doctrine of res ipsa loquitur to get around the need to establish the standard of care.

In addition to relying on the doctrine of res ipsa loquitur, Hudson contends that a jury could infer negligence from the decision to change a course of medication that had been working, particularly in the absence of any evidence submitted by the government of a medical reason for changing the dosage. Hudson did not necessarily need to present testimony from an independent expert. Even under Wisconsin's rule it was possible for him to use other medical testimony to establish a breach of the standard of care; a statement from the doctor who prescribed the 260 mg might have sufficed, as in *Gil v. Reed*, 381 F.3d at 660, where we concluded that the plaintiff introduced sufficient evidence of a breach of the standard of care through testimony that a surgeon hired by the prison reacted angrily when he learned that a prison doctor had ignored explicit instructions for postoperative care. But here, Hudson did not supply his previous medical records to establish that his existing dosage had been effective at keeping his serum concentration in the optimum range, nor did he offer an opinion from his prior doctor to establish that a different dosage would be inappropriate. And so we are left with dueling prescriptions—one for 260 mg and one for 200 mg—with no evidence that either was improperly prescribed.

Finally, we note that Hudson also complains that the district court erroneously "converted" his original action under *Bivens v. Six Unknown Named Agents of FBI*, 403 U.S. 388 (1971), into one under the FTCA. But his argument is unclear. Hudson originally claimed deliberate indifference in a suit against several members of Oxford's medical staff. The pharmacist was the only defendant to survive screening under 28 U.S.C. § 1915A, and

later the court dismissed the *Bivens* suit altogether after concluding that the pharmacist, as a commissioned officer of the United States Public Health Service, is statutorily immune under 42 U.S.C. § 233(a). Hudson then moved to reopen his case as an FTCA claim and proceeded under that theory. Hudson, not the district court, altered the nature of the case, and we cannot tell from Hudson's appellate briefs whether he contests the initial screening order dismissing some of the defendants or the conclusion that the pharmacist cannot be sued under *Bivens*. We do not craft arguments for the parties, *Serafinn v. Local 722, Int'l Bhd. of Teamsters*, 597 F.3d 908, 916 (7th Cir. 2010), and so we decline to examine the dismissed *Bivens* action.

**AFFIRMED**.