¶ 258.
DANIEL KELLY, J.
(dissenting.) I dissent, respectfully, because we missed an opportunity to clarify the standards for admission of expert testimony. This lack of clarity caused us to affirm the *637 admission of testimony that does not satisfy the requirements of Wis. Stat. § 907.02 (2013-14).[1]
¶ 259. I agree with the lead opinion that an expert's personal experience can qualify him as an expert under Wis. Stat. § 907.02, making his testimony sufficiently "reliable" for admission to the jury. But that just begs the question: In light of that personal experience, to what is the admitted expert qualified to testify? Here, Dr. Wener's task was to identify and describe the standard of medical care against which to measure Dr. Balink's performance of her duties. His testimony failed to satisfy Wis. Stat. § 907.02 because there was no apparent match between this objective and his qualification as an undeniably accomplished obstetrician/gynecologist. As it turns out, we focused so narrowly on Dr. Wener's sterling professional credentials that we let him become the thing about which he was supposed to testify. That is, instead of determining whether Dr. Wener was qualified to discover and describe the proper standard of medical care, we found that he is the standard of medical care.
I
¶ 260. The primary question this case presents is whether the plaintiffs identified a proper standard of medical care against which a jury could measure Dr. Balink's performance in the delivery of Braylon Seif-ert.[2] Even though this case progressed through a jury trial, an appeal, and review by this court, I find that I *638 still do not know what that standard might be, or whether Dr. Wener was qualified to describe it.
¶ 261. Here is what we do know. We know young Seifert suffered a grievous injury at birth. We know the injury was caused by the manner in which he was delivered. We know he could have been delivered differently. We know that Dr. Wener says that if young Seifert had been delivered according to the practices and procedures he described, the injury very likely would not have occurred. And I believe he is right.
¶ 262. What I do not know is whether young Seifert's delivery was done negligently. The reason I do not know this is because no one described what care we should expect from the reasonably qualified family practitioner in the circumstances revealed by this case. That is, the jury never received a proper measuring stick against which to compare Dr. Balink's performance of her obligations.
¶ 263. As we sketch out the contours of Wis. Stat. § 907.02,[3] I think we should use a sharper pencil. As it is, we have not made the necessary distinction between the thing about which an expert is to testify, on the one hand, and on the other, the qualification to so testify. Because we did not make that distinction, it almost necessarily followed that our "qualification" inquiry focused on the wrong question.
*639 ¶ 264. The Seiferts tasked Dr. Wener with demonstrating that Dr. Balink delivered young Seifert negligently. That task comprises two separate responsibilities. First, Dr. Wener needed to identify the proper standard of medical care under the circumstances of this case. Francois v. Mokrohisky, 67 Wis. 2d 196, 200-01, 226 N.W.2d 470 (1975). And second, he had to opine on whether Dr. Balink's performance fell short of that standard. Christianson v. Downs, 90 Wis. 2d 332, 338, 279 N.W.2d 918 (1979) ("Unless the situation is one where the common knowledge of laymen affords a basis for finding negligence, expert medical testimony is required to establish the degree of care and skill required of a physician."). Competence in one of these subjects does not automatically conclude competence in the other. The proper standard of medical care and the failure to meet that standard are distinct subjects and should receive distinct treatment. This means the proffered expert must satisfy the court he has the necessary qualifications to speak on each one.
¶ 265. We did not, however, require this of Dr. Wener. That is, we allowed the Seiferts to graft Dr. Wener's competence to testify with respect to the second inquiry (performance in relation to the standard) onto the first (identification of the standard). Perhaps he can authoritatively speak on both subjects, but we do not know because no one asked. And he was not asked because there was insufficient appreciation of the need to conceptually separate the two inquiries. Here is what I mean.
A
¶ 266. I assume Dr. Wener is a very talented obstetrician. Indeed, for the sake of illustration, I will assume he is the gold standard when it comes to *640 delivering babies under the circumstances this case presents. To what, then, shall we have him testify? Shall we learn from him the optimal means of delivering babies in those circumstances? Or should he teach us how the reasonably qualified family practitioner delivers babies in such circumstances? There are potentially leagues of difference between the answers to these questions. If we select the first, we will hear about the best possible practices that could have been followed in young Seifert's delivery. If we select the second, however, we will hear what we may legitimately expect from any given family practitioner. Put another way, the first option informs us of the care we all want, while the second describes the standard of medical care to which we may hold all family practitioners accountable.
¶ 267. Qualifying under the first option is pretty straightforward. Having established himself as the gold standard, it necessarily follows that Dr. Wener may authoritatively opine on how he would deliver a baby when confronted with patients like the Seiferts. Thus would he establish the standard of medical care for the case, a reference point we might usefully call the "What Would Wener Do" standard ("WWWD"). This is a narrowly vertical inquiry—we explore the depth, and precision, of his knowledge, experience, and practice in relation to the circumstances at hand.
¶ 268. As I will explain at greater length below, qualifying under the second option calls for something different. It is a broadly horizontal inquiry. It requires that the testifying doctor have more than just knowledge of the best method of delivering a baby in such circumstances. In light of the natural variability inherent in the practice of medicine, it requires that he be familiar with what is generally expected of reasonably *641 qualified practitioners under similar circumstances.[4] He must have a source of knowledge that informs him of what other doctors do under similar circumstances, or describes what they ought to do, or what they must do. His knowledge of such things must be extensive enough that he can distill from it certain practices and procedures of sufficiently widespread implementation that one may conclude that they represent a standard known to reasonably qualified doctors in the relevant field of practice.
¶ 269. If he cannot do this, and yet he testifies, then we allow him to collapse the medical field into himself, and we appoint him the reference point against which we measure all doctors who deliver babies. For the following reasons, I believe this is untenable, and it is not what Wis. Stat. § 907.02 either requires or authorizes.
1
¶ 270. I will begin by describing the nature of the standard applicable to this case. That is, I will explain why I believe it is essential that the standard be external to the testifying expert. Afterwards, I will address Dr. Wener's qualification to testify regarding that standard.
¶ 271. The Seiferts bore the burden of establishing the standard of medical care to which they wished to hold Dr. Balink accountable. Carney-Hayes v. Nw. *642 Wis. Home Care, Inc., 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 699 N.W.2d 524. Generally speaking, expert testimony is necessary to meet that burden: "Unless the situation is one where the common knowledge of laymen affords a basis for finding negligence, expert medical testimony is required to establish the degree of care and skill required of a physician." Christianson, 90 Wis. 2d at 338. Negligence, in this case, turns (at least in part) on recognizing circumstances that call for a three-hour glucose diagnostic test (rather than a one-hour screening test), when it is necessary to perform an ultrasound examination of the baby immediately before delivery, and when a vacuum assistance device may or may not be used to assist the baby in making his exit from the birth canal. These are not subjects on which laypeople would commonly find themselves knowledgeable.
¶ 272. The expert's first task, therefore, is to identify the relevant standard of medical care, which must "be established by a determination of what it is reasonable to expect of a professional given the state of medical knowledge at the time of the treatment in issue." Nowatske v. Osterloh, 198 Wis. 2d 419, 438-39, 543 N.W.2d 265 (1996), abrogated on other grounds by Nommensen v. Am. Cont. Ins. Co., 2001 WI 112, 246 Wis. 2d 132, 629 N.W.2d 301. This means one may not establish a standard with reference to what one doctor, or a non-representative sampling of doctors, would do under the circumstances. A "standard" is not the same thing as the existence of alternative procedures or more accomplished practitioners.
¶ 273. A standard is, instead, normative. It is a reference point external to the testifying doctor, something commonly accessible by those practicing in the relevant field:
*643 True, there was evidence that other physicians might have acted differently and that there were alternate procedures available, but no physician testified that what was done did not comport with approved medical practice under the circumstances. As we said in Trogun v. Fruchtman, 58 Wis. 2d 569, 584, 207 N.W.2d 297 (1973):
'(A) plaintiff must prove the defendant failed to give him, not the highest degree of care, but merely the reasonable care and skill usually possessed by physicians of the same school. .. .'
Francois, 67 Wis. 2d at 201 (emphasis added). A physician answers to this normalized reference point, not to the WWWD standard of medical care: "He is obliged to conform to the accepted standard of reasonable care, but he is not liable for failing to exercise an extraordinary degree of care." Id. (emphasis added).
¶ 274. Other courts reject self-referential standards of medical care, too. Massachusetts says that "[b]ecause the standard of care is based on the care that the average qualified physician would provide in similar circumstances, the actions that a particular physician, no matter how skilled, would have taken are not determinative." Palandjian v. Foster, 842 N.E.2d 916, 920-21 (Mass. 2006). The Michigan Supreme Court recently addressed this issue in Elher v. Misra, 878 N.W.2d 790 (Mich. 2016) (per curiam). It rejected the proffered expert's testimony because "his opinion was based on his own beliefs, there was no evidence that his opinion was generally accepted within the relevant expert community, there was no peer-reviewed medical literature supporting his opinion, plaintiff failed to provide any other support for [the expert's] opinion, and defendants submitted contradictory peer-reviewed literature." Id. at 798 (em *644 phasis added). California has long recognized that "the fact that another physician or surgeon might have elected to treat the case differently or use methods other than those employed by defendant does not of itself establish negligence." Lawless v. Calaway, 147 P.2d 604, 607 (Cal. 1944). The District of Columbia says that "[t]he personal opinion of the testifying expert as to what he or she would do in a particular case, without reference to a standard of care, is insufficient to prove the applicable standard of care." Travers v. District of Columbia, 672 A.2d 566, 568 (D.C. 1996). South Carolina's court of appeals has similarly stated that if an expert "merely testifies as to his own personal standard of care, rather than the generally recognized and accepted standard of care, such testimony is insufficient to survive summary judgment." Melton v. Medtronic, Inc., 698 S.E.2d 886, 893 (S.C. Ct. App. 2010). In Wallbank v. Rothenberg, 74 P.3d 413, 416 (Colo. Ct. App. 2003), the Colorado Court of Appeals said that "a standard of care may not be established by the testimony of the personal practices of expert witnesses." Georgia also follows this rule: A party "may not establish the applicable standard of care with evidence of an expert witness's personal practices, or evidence about the course of conduct the expert would have followed under similar circumstances." Dendy v. Wells, 718 S.E.2d 140, 144 (Ga. Ct. App. 2011). Arizona's court of appeals recognizes that testimony regarding a physician's personal practices can be useful to the jury, but only after the standard of care is established. See Smethers v. Campion, 108 P.3d 946 (Ariz. Ct. App. 2005).[5]
*645 ¶ 275. Nor may physicians smuggle their own practices or preferences past the Daubert gatekeeper by box-checking expected phrases. Missouri's court of appeals provided the only logical response to such an effort. It reasoned that "[i]n articulating the appropriate legal standard of care, it is insufficient for an expert merely to use the terms 'accepted medical standards' or 'standards of care.'" Sheffler v. Arana, 950 S.W.2d 259, 267 (Mo. Ct. App. 1997). Instead, the court said "an expert should be properly oriented with the meaning of negligence in a health care provider context and, in fact, employ the legal standards in offering his opinion." Id. The court recognized that "[t]he purpose of these requirements is to prevent experts from relying upon their own views of acceptable practice rather than applying the objective legal standards." Id.
¶ 276. Our cases, and those across the country, teach us that a proper standard of medical care is one that is "approved," "generally recognized," "customary," "generally accepted," or "objective," and that describes skills "usually possessed" by a physician in the relevant field of practice. However one chooses to synthesize this into a single descriptor, the manifest import is that a standard of medical care exists separately and apart from the testifying expert, it is widespread within the relevant medical community, it has gained at least some acceptance, and it is legitimate to charge a reasonably qualified physician with its knowledge.
*646 2
¶ 277. Doctor Wener did not identify such a standard. One of the consequences of not requiring the expert to focus on an external, generally-known standard is that the resulting testimony resolves into a self-portrait. As the circuit court and the lead opinion's characterization of his testimony demonstrate, that is largely what happened here:
• "Dr. Wener formulated an opinion about the standard of reasonable care of family practice doctors practicing obstetrics on the basis of his experiences. . . ." Lead op., at ¶ 103.
• Dr. Wener's methodology consisted of the "conscientious use of the thousands of instances in which he had delivered babies and made decisions about the care of individual patients and his teaching and hospital experiences relating to obstetrics." Lead op., at ¶ 105.
• " [Essentially a comparison of the instant case to other deliveries . . . ." Lead op., at ¶ 106.
« "He used his many experiences to arrive at an opinion in the instant case that is sufficiently similar to his vast array of clinical experiences over decades of practice." Lead op., at ¶ 107.
• "The circuit court ruled that Dr. Wener's methodology was reliable based on Dr. Wener's extensive personal experiences." Lead op., at ¶ 109.
f 278. A review of the transcript confirms the accuracy of these characterizations. Here, for example, is the closest Dr. Wener came to establishing any standard of medical care with respect to use of a vacuum to assist in the delivery of young Seifert:
*647 My opinion is that the standard of care required that a vacuum not be applied on this child at all. Because of the risk factors already established for shoulder dys-tocia, and knowing that the vacuum is the largest of the risk factors, you're adding a major risk factor on top of that. And in my opinion that's why the baby had a severe brachial plexus injury.
That may or may not be a proper standard of medical care, but because he never described how he goes about discovering such standards, this ends up as the type of ipse dixit that Sheffler properly rejected.
¶ 279. With respect to whether Dr. Balink should have performed an ultrasound immediately before young Seifert's birth, Dr. Wener said: "I would have known that an ultrasound—assuming it's done within the standard of care—would have been within 10 to 15 percent off. And [with] a baby that's 9 pounds 12 ounces, [an] ultrasound would have shown a macroso-mic infant." This is two steps removed from establishing a standard of medical care. First, he is simply describing what he knows. And second, he says nothing about whether this knowledge necessarily means an ultrasound should have been done immediately before birth to meet the applicable standard of medical care. And if he believes this is what is required to meet the standard, he has offered nothing to establish how he knows this is, in fact, the standard.
¶ 280. Dr. Wener's testimony reveals he is impressively qualified along the vertical axis; his experience and knowledge are deep, deep. Surely this is the physician one would want in attendance when faced with the Seiferts' situation. But his testimony along the horizontal axis was almost non-existent. What he described was what he would have done had he been the attending physician. That, is, he testified that the *648 relevant standard of medical care was WWWD; he told us little about what a reasonably qualified family practitioner ought to have done for the Seiferts. Consequently, the jury received the case without knowing the proper standard against which to compare Dr. Balink's performance. And that is why we still do not know whether Dr. Balink negligently delivered young Seifert.
B
¶ 281. So now I arrive at the subject that gave rise to our consideration of this case: Dr. Wener's qualification under Wis. Stat. § 907.02 to testify about his opinions. This statute contains both subjective and objective criteria, both of which he must satisfy before giving his thoughts to the jury:[6]
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.
Wis. Stat. § 907.02(1).
*649 ¶ 282. On the objective criterion, Dr. Wener may testify if his opinions are "based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case." Id. With respect to the subjective criterion, he must be "qualified as an expert by knowledge, skill, experience, training, or education." Id.
1
¶ 283. I have already addressed the objective criterion—it is the standard of medical care. In the context of this case, "facts or data" are situations like the Seiferts' and how reasonably qualified family practitioners respond to them. The "reliable principles and methods" are the means by which a qualified expert informs himself of those facts and data. As described above, Dr. Wener offered no such testimony. He did not offer testimony about the skills usually possessed by family practitioners who deliver babies. He did not .tell us what the "generally accepted" practices might be, what is "approved," or "generally recognized," or "customary." Nor did he say anything about the "principles and methods" he used to discover that information. Instead, he offered himself—a supremely qualified obstetrician—as the standard of medical care. The result was a conflation of the objective and subjective criteria.
¶ 284. This was a mistake for two reasons. First, by allowing Dr. Wener to become the standard against which to measure Dr. Balink's performance, we eliminate the concept of a consistent and knowable standard against which to measure a physician's performance. It's WWWD this time. But the plaintiffs in the next malpractice case might employ a different expert *650 witness, thereby establishing a new standard. So as a practical matter, no one will know the "standard" of medical care until the plaintiffs reveal their expert witness.
¶ 285. Second, even if it is appropriate to pick a specific doctor and make his practices the touchstone, as opposed to an objectively-verifiable standard external to the expert, we allowed the plaintiffs in this case to pick the wrong doctor. Dr. Wener is an obstetrician. Dr. Balink is a family practitioner. The standard of medical care expected of each are not the same. We must assess a physician's conduct in the context of the field in which she practices. Phelps v. Physicians Ins. Co. of Wis., Inc., 2005 WI 85, ¶ 40, 282 Wis. 2d 69, 698 N.W.2d 643. This is such an embedded principle in our law that it even appears in our pattern jury instructions:
In (treating) (diagnosing) (plaintiff's (injuries) (condition), (doctor) was required to use the degree of care, skill, and judgment which reasonable (doctors who are in the general practice) [or] (specialists who practice the specialty which ( doctor ) practices) would exercise in the same or similar circumstances, having due regard for the state of medical science at the time (plaintiff) was (treated) (diagnosed). A doctor who fails to conform to this standard is negligent. The burden is on (plaintiff) to prove that (doctor) was negligent.
Wis. JI—Civil 1023 (emphasis added). So if the expert himself is to be the standard, we should at least require that he is from the same field of practice.[7]
*651 f 286. Dr. Wener's testimony neither identified a standard external to himself, nor did it describe what we should expect of a family practitioner, as opposed to an obstetrician. His testimony should have been excluded because it did not satisfy the objective criterion of Wis. Stat. § 907.02. Not because he was unqualified to testify about what he would have done had he been the attending physician (no one is better qualified to offer that testimony), but because in the main he did not describe what we may expect of reasonably qualified family practitioners, and so failed to satisfy the objective criterion.
2
f 287. I say Dr. Wener did not describe the required standard "in the main" because there were a few pieces of testimony that contained the seed of such a standard. For example, with respect to when a three-hour glucose test should be conducted based on the results of the one-hour glucose screening, Dr. Wener said the following:
Q: You're also aware that some, as you mentioned some people use a 140?
A: Yes.
Q: [0]f what significance was it that the glucose tolerance one hour testing revealed to be 131?
A: Well 131 is abnormal. By 2009, those providing obstetrical care were using 130. For many, many years prior to that it had been 140. And then probably *652 around the turn of the century .. . changed to 130. And by 2009 most everyone was using 130. . . . And to use 140 as a cut off is not the right number.
This, of course, is just one piece of information that goes into describing what a reasonably qualified doctor would do for the Seiferts (although whether it describes the "cut-off1 family practitioners, as opposed to obstetricians, were using as of 2009 cannot be determined from the testimony).
¶ 288. If this seed had matured into a fully-formed objective standard applicable to family practitioners, we would ask whether Dr. Wener satisfied the subjective criterion of Wis. Stat. § 907.02. We do so by looking to his "knowledge, skill, experience, training, or education." Id.
f 289. But we would not look at those qualities in a vacuum—we would be interested in them insofar as they bear on the objective criterion (the standard of medical care). That is, we must allow the standard of medical care to focus our attention on the type of background we should require of the proffered expert witness. In this case, we would ask not whether Dr. Wener is a well-qualified obstetrician (he is). We would instead ask whether he has the knowledge, experience, training, or education necessary to search out and describe the standard of medical care we may reasonably expect a family practitioner to meet.
¶ 290. The background required by the subjective criterion may not be as obvious as it might appear. As much as we wish the practice of medicine to be a scientific endeavor, it inescapably encompasses a substantial amount of art. And to the extent it is a science, it is nonetheless constantly developing and evolving. All physicians learn the practice of medicine in (presumably) the same general sense—they attend medi *653 cal school. But the United States has 147 medical schools,[8] and it is reasonable to expect that each will offer instruction that varies in technique, emphasis, expertise, and extent. The current result of those natural variations is over 900,000 practicing physicians[9] spread amongst 5,600 hospitals[10] and many additional smaller clinics and offices.
¶ 291. Theoretically, those initial variations could amplify once the physician begins his practice and encounters new methods, analyses, equipment, or experiences. Or, conversely, they could dampen as the hospitals and other centers of practice impose some measure of uniformity on practitioners. Whichever it is, the result is the same—there is no obvious playbook to which we, or a practitioner, may readily resort to determine what "ought" to be done in every given circumstance. The "ought" is out there, but courts and juries are not equipped to identify it on their own. That is why we need experts to sift through all the different ways in which physicians treat their patients, the extant literature on the subject at hand (if any), and information from any other potentially instructive *654 source, to identify the common threads with which to stitch together a standard of medical care.
¶ 292. The background required to do a competent job of such sifting and identifying is not necessarily the same as the background that leads to successful, injury-free deliveries of babies like young Seifert. This case calls for an expert who is familiar with the type of training and experience typical of family practitioners (not obstetricians), the type of equipment available to them, the tests and diagnostic procedures they commonly employ, and their practical responses to situations like that of the Seiferts. This is a background that reflects a broadly horizontal outward focus—what do others know, and experience, and do? It may be that Dr. Wener has that kind of background and knowledge, but he did not speak of it in this case.
¶ 293. This division between subjective and objective criteria is essential to the rule of law as it relates to negligence, especially in the context of medical malpractice. When the Seiferts asserted their cause of action against Dr. Balink, the import of their claim was that there existed a knowable standard of medical care and that she failed to conform to that standard when she delivered young Seifert. Dr. Balink did not know that a court, sometime in the future, would decide that the standard governing her conduct would be WWWD. And there is no apparent reason why she should have known that.
¶ 294. To the extent the lead opinion concludes that a person's personal experience can qualify him as an expert witness for the purpose of testifying about a standard of medical care, I have no dispute. But because our pencil was not sharp enough in answering *655 that question, the holding we announce today is that an individual doctor's personal experience can be the standard of medical care.
¶ 295. And for that reason, I respectfully dissent.
¶ 296. I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this dissent.

 Dr. Balink phrased the issue as whether "an expert witness' qualifications and personal preferences [are] alone sufficient to meet Wis. Stat. § 907.02(l)'s new reliability standard?" Although this framing conflates the statute's subjective *638 and objective criteria (as I discuss below), and so obscures the gravamen of her concern, there is no doubt her central complaint is that the plaintiffs' expert witness did not identify a proper standard of medical care.

 The standard described in this statute was first enunciated in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and later formalized as Federal Rule of Evidence 702 (as amended in 2000). Because § 907.02(1)'s wording mirrors that of the Federal Rule, and other states have followed suit, I will follow the lead opinion's example in consulting relevant cases from other jurisdictions.

 Francois v. Mokrohisky, 67 Wis. 2d 196, 201-02, 226 N.W.2d 470 (1975) ("The standard to which [physicians] must conform ... is determined by the practices of neither the very best nor the worst of the class. Like automobile drivers, engineers, common laborers, and lawyers, they are obliged to conform to reasonable care in the circumstances.").

 Treatises reflect the same principles. See, e.g., 29 Charles Alan Wright & Victor Gold, Federal Practice & Procedure: Evidence § 6268.1 (2d ed. 2016) ("In a non-scientific context, the reliability of an expert's methodology often will be a *645 function of accepted practice in the area of expertise in question."); 5 D.W. Louisell & H. Williams, Medical Malpractice § 29.01, at 29-7 (2005) ("The standard is measured against what a reasonably prudent practitioner in the defendant's position would do, not what any individual physician or physicians might do.").

 I use the terms "subjective" and "objective" in their grammatical sense. These terms separate the one testifying (the subject) from the thing about which the subject is testifying (the object). So the subjective element of Wis. Stat. § 907.02 inquires into Dr. Wener's qualifications, while the objective element concentrates on the thing about which he testifies (the standard of medical care).

 If the expert offers proper testimony—that is, a standard of medical care external to himself—then it is not necessary that he come from the same field of medical practice as the physician in question. Thus, if Dr. Wener can demonstrate he has the requisite knowledge to identify and describe the *651 standard of medical care applicable to family physicians in these circumstances, there is no reason he could not qualify as an expert.

 About the AAMC, Assoc, of Am. Med. Colleges (last visited Jan. 3, 2017), https://www.aamc.org/about.

 Total Professionally Active Physicians, The Henry J. Kaiser Family Found, (last accessed Jan. 3, 2017), http://kff.org/other/state-indicator/total-active-physicians/?currentTimeframe=0&selectedRows=%7B%22ne-sted%22:%7B%22all%22:%7B%7D%7D,%22wrapups%22:%7B %22united-states%22:%7B%7D%7D%7D&sortModel=%7B%2 2colId%22:%22Location%22,%22sort%22:%22asc%22%7D (stating that in September 2016 there were 926,119 practicing physicians in the United States).

 Fast Facts on US Hospitals, Am. Hosp. Ass'n (Jan. 2016), http ://www. aha.org/research/rc/stat-studies/fast-facts. shtml (stating that in January 2016 there were 5,627 U.S. hospitals registered with the American Hospital Association).